Edith CITRON, Plaintiff
Below, Appellant,

v.

FAIRCHILD CAMERA AND INSTRU-
MENT CORPORATION, Wilfred J. Cor-
rigan, William C. Franklin, William A.
Stenson, Walter Burke, Alvin C. Rice,
C. Lester Hogan, Albert Bowers, Walter
J.P. Curley, Schlumberger (California)
Inc., Schlumberger Technology Corpo-
ration and Schlumberger Limited, De-
fendants Below, Appellants.

Supreme Court of Delaware.

Submitted: Jan. 18, 1989.
Decided: Dec. 22, 1989.

Anthony L. Tersigni (argued) (Richard N. Gray, of counsel, of Meyers, Tersigni, Lurie, Feldman & Gray) New York City, Joseph A. Rosenthal, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington (Marian Rosner, of counsel, of Wolf, Popper, Ross, Wolf & Jones, New York City), for plaintiff below, appellant.

Kathleen M. Comfrey (argued), Joseph P. Cyr (Lawrence J. Slattery, of counsel, of Shearman & Sterling, New York City), H. Murray Sawyer, Jr., of Sawyer & Akin, P.A., Wilmington, for defendants below, appellants Albert Bowers, Walter J.P. Curley, William C. Franklin, Alvin C. Rice, and William Stenson.

Michael D. Goldman (argued), Donald J. Wolfe, Jr., Richard L. Horwitz, of Potter, Anderson & Corroon, Wilmington, for defendants below, appellants Fairchild Camera and Instrument Corp.

Steven J. Rothschild (argued), Andrew J. Turezyn, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for defendants below, appellants Wilfred J. Corrigan and C. Lester Hogan.

Richard R. Cooch, of Cooch & Taylor, Wilmington (Beveridge & Diamond, of counsel, Washington, D.C.), for defendant below, appellant Walter Burke.

Before HORSEY, MOORE, and HOLLAND, JJ.

HORSEY, Justice.

Plaintiff appeals from the Court of Chancery's decision after trial granting final judgment for the defendants on all claims for relief. Plaintiff, Edith Citron, brings a class action on behalf of all stockholders of Fairchild Camera and Instrument Corporation ("Fairchild"), a Delaware corporation, who sold their shares to Schlumberger (California) Inc. ("Schlumberger"), a Delaware corporation, pursuant to a May 29, 1979 tender offer, or who had their shares converted into cash in the subsequent merger of Schlumberger into Fairchild on September 28, 1979. The appearing defendants are Schlumberger, Fairchild and eight of its nine directors as of May 4, 1979, one of Fairchild's directors not having been named as a defendant.[1]

Citron asserts claims of wrongdoing by all of the defendants in Fairchild's acquisition by Schlumberger. Eight of Fairchild's nine directors are charged with breach of their fiduciary duties of good faith and due care and with gross negligence in recommending that Fairchild's shareholders accept Schlumberger's $66 all-cash, all-shares, fully funded tender offer over a proposal of Gould, Inc. ("Gould"), an Illinois-based corporation. Gould's proposal consisted of a conditional two-tiered tender offer of $70 cash for 42% of the company, with the remaining 58% of Fairchild's shares to be acquired at an unstated later date in a share-for-share exchange of Fairchild common for a new issue of Gould preferred on terms to be later negotiated. Plaintiff argues that both the bidding process and the board's final recommendation were tainted by the self-interest of one director, its chairman. Plaintiff further contends that Schlumberger's offer to purchase was materially misleading and that the Chancellor committed reversible error in rejecting plaintiff's challenge to the fairness of the merger. After a thorough re-

---

1. Also named as defendants were Schlumberger Technology Corporation and Schlumberger Limited (corporate parents of Schlumberger), who were not served since they were not subject to *in personam* jurisdiction. The class, as certified by the court, does not include Fairchild shareholders who are defendants or members of their immediate families.

view of the record, we find no basis for reversal.

We affirm the trial court's pivotal ruling that the Fairchild board's decision to recommend Schlumberger's all-cash offer over Gould's two-tier offer was protected by the business judgment rule. We find the record to support the court's findings that Fairchild's board acted in good faith and with due care in a transaction not involving director self-interest and that Fairchild's "predominantly 'outside' board" was not dominated by its chairman. The record also supports the court's finding that Gould was not left out of the bidding process or that Schlumberger was unfairly favored in the bidding. We also conclude that the court did not err: in refusing to find Fairchild's board to have breached a *Revlon* duty in accepting Schlumberger's offer over Gould's proposal; in rejecting plaintiff's fairness claim; and in finding no merit in defendants' alleged material disclosure violations. Accordingly, we affirm on all issues.

## I

In stating the facts, we rely primarily upon the Chancellor's detailed and lengthy findings in his unreported 60–page memorandum decision following a ten-day trial. Fairchild, a California-based company, had been a pioneer in the semiconductor industry. However, by the mid–1970s, Fairchild's performance had been adversely affected by a combination of factors, in particular, the emergence of the Japanese as competitors, Fairchild's cutback of research and development, and its failure to invest the capital necessary to meet the increased competition. A part of Fairchild's decline was also attributable to an exodus of key employees who left to form their own competing, and successful, companies. The departure of these employees, talented scientists and technicians, in the highly technical semiconductor industry created a continuing source of concern to management and its board of directors.

By the late 1970s, Fairchild was suffering losses from an ill-fated diversification into the consumer products area (e.g., digital watches). Fairchild's earnings per share over the 1970s reflect an erratic, unimpressive, and generally declining financial performance. Compounding the problem, between 1970 and 1975, the semiconductor industry suffered two major recessions.

With the increased competition in the semiconductor industry was a corresponding increase in hostile takeovers. In response, Fairchild's board in 1977 began to consider Fairchild's alternatives and the board's responsibilities in the event of an unsolicited tender offer, including its available defenses. In April 1978 management retained Kidder, Peabody & Co. ("Kidder") to analyze Fairchild's financial position and to advise it with respect to potential proposals for its acquisition.[2]

Of Fairchild's ten-member board of directors, only two were officers or employees of the company during the relevant period. The insiders were Wilfred J. Corrigan and Dr. C. Lester Hogan. Corrigan had become a director, president, and chief executive officer in 1974. He was elected chairman of the board in 1977. Hogan, a director since 1968, had served as president and CEO of Fairchild and was elected vice-chairman of the board in 1974. He remained a full-time employee of the company until June 1979, when he took semi-retired status.

Fairchild's remaining eight directors were outsiders. Walter Burke, a board

**2.** In a report dated June 29, 1978, Kidder performed a financial analysis of Fairchild which included an intrinsic value analysis. Kidder reviewed the source and quality of Fairchild's earnings, asset values and liabilities, and compared its stock price and price/earnings ratios to other semiconductor companies. It also complied merger trends generally and in selected technology sectors.

Fairchild's board had considered defensive measures such as staggered boards and supermajority voting requirements. However, Fairchild's board had not adopted any preventive or offensive measures as a result of Kidder's report.

In early 1979, Kidder refused to renew its contract to advise Fairchild, stating that it was representing someone interested in acquiring Fairchild.

member since 1960, was also president of the Sherman Fairchild Foundation ("Fairchild Foundation"), a major shareholder of the company holding approximately 11½% of Fairchild's stock. Fairchild stock constituted more than 20% of the Foundation's assets.

Roswell Gilpatric, a highly experienced and respected corporate attorney, began advising Fairchild as outside counsel in 1942 and joined Fairchild's board in 1966. Gilpatric served as chairman of the board from 1975 to 1977. In 1979, he was a member of the executive and compensation committees of the board. Gilpatric had served on a number of boards of large corporations, including CBS Inc., that had been targets of hostile takeover efforts. As will be seen, Gilpatric played a leading role in the sale of Fairchild but was the *one* Fairchild director not named as a defendant nor charged with any wrongdoing.

William C. Franklin, a Fairchild director since 1936, and William A. Stenson, a director since 1967, each had extensive experience in commercial and investment banking. Stenson was also a knowledgeable institutional investor. Dr. Albert Bowers was president, CEO, and chairman of Syntex, Inc., a large California-based pharmaceutical company; and Walter J.P. Curley was former U.S. Ambassador to Ireland. Both joined the board in 1976, Bowers, at Corrigan's suggestion, and Curley, at Gilpatric's. Alvin C. Rice, a senior officer at the Bank of America, joined the board in 1977, also at the suggestion of Corrigan. The ninth director, Louis Polk, former president of MGM, became a director in 1968. He served until May 1979.

The Chancellor found that the "Fairchild board was comprised predominately of experienced businessmen who were not officers or employees of the company and that the board was not dominated or controlled by any individual director, although certain of the directors were more active than others." [3]

## A.

In the first few months of 1979, the trading activity in Fairchild stock increased as did the price of the stock. Between January and early April, the price rose from $29 to in excess of $45 per share. Over the same period, the members of the board became aware of rumors in the financial community and press that Fairchild might become an acquisition target. On February 21, 1979, Felix Rohatyn of Lazard Freres & Co. ("Lazard") contacted Gilpatric to tell him that one of Rohatyn's clients, not identified at the time, was interested in negotiating a proposal to acquire Fairchild if and when the company was for sale. Gilpatric did not pursue the conversation.

On March 9, 1979, Fairchild retained the firm of Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton") to render legal advice in anticipation of unsolicited acquisition proposals or tender offers. On the same date, the board's executive committee approved management's proposal to retain Salomon Brothers (in lieu of Kidder, *see supra* n. 2) to render financial advice. [4] Salomon Brothers had acted as an advisor to the company in other matters and had analyzed Fairchild's capital structure, projected earnings, and long-term financial needs of the company. [5] The board retained First Boston in a "backup" capacity. That firm also generated a detailed written financial analysis.

## B.

On April 25, 1979, William T. Ylvisaker, the chairman of Gould, Inc. ("Gould"), an Illinois-based manufacturer of electronic

---

**3.** The court noted Roswell Gilpatric's testimony at trial that "of all the boards I have been on, I ... never was better informed than I was ... as a director of Fairchild."

**4.** Salomon's retainer agreement consisted of a flat fee "not to exceed $500,000 and a 5% contingent fee based on the difference between any *initial offer and the price ultimately paid.*"

**5.** Salomon Brothers prepared a report for Fairchild in April 1979, which examined the company in depth. The report outlined the company's future financing requirements as well as its estimated future operating results.

products but not a significant factor in the semiconductor industry, telephoned Corrigan indicating interest in making an offer for Fairchild. Corrigan responded that the company was not interested in being acquired, but if Gould submitted a written proposal, Corrigan would present it to Fairchild's board. Later that afternoon Gould submitted a written proposal for a "business combination." Gould's letter described its proposal in the following general terms:

> Accordingly, our proposal is to acquire 45% of Fairchild's outstanding shares of common stock for $54.00 cash per share and the balance for Gould Inc. common stock. This arrangement could have tax benefits to your stockholders who receive Gould Inc. common stock.

The proposal (hereafter Gould's "first proposal") did not indicate on what basis Gould's common stock would be exchanged for "the balance of" Fairchild's shares. Gould's proposal concluded:

> We would expect Fairchild to operate as a separate subsidiary of Gould. We would anticipate appropriate representation on the Fairchild Board of Directors, and we would invite Fairchild representation on the Gould, Inc. Board of Directors. We have no plans to change the nature of Fairchild's operations, the locations of its headquarters and principal facilities, or its present management. We expect to continue to operate Fairchild so as to retain the goodwill of its employers and customers and to maintain or improve employee benefit and compensation programs.

Corrigan immediately scheduled an "all hands" meeting of management, Salomon Brothers, and Wachtell Lipton two days later in California. That same evening, Corrigan and Nelson Stone, Fairchild's general counsel, contacted the members of Fairchild's board to inform them of Gould's proposal. The board was notified that Gould's proposal would be taken up at the board's next regularly scheduled meeting, May 3. Corrigan also discussed Gould's proposal with Gilpatric and outside counsel for the Fairchild Foundation. It was agreed that director Burke, also president of the Foundation, was the appropriate person to meet with Ylvisaker, Gould's chairman.

Ylvisaker had also contacted Burke on April 25 to outline Gould's proposal, and the following day they met. Ylvisaker informed Burke of Gould's "splendid" record in digesting acquisitions and of Gould's "respect" for Fairchild. He stressed that Gould's proposal was a friendly one and that Gould wanted to retain Fairchild's management. Burke reported his meeting to Corrigan and Gilpatric and to the other board members.

A Fairchild "Company Private" evaluation of Gould reported, however, that:

> Gould's policy regarding acquisitions is to break up the existing organization and to fit the acquired company's operations into Gould's existing divisions. Few members of the acquired company's top management have remained with Gould under this system.

Burke and other directors of Fairchild were aware of Gould's reputation of being "quite ruthless" in turning out management of an acquired company. Corrigan, as well as other outside directors of Fairchild, were then of the view that Fairchild should remain independent.

On April 27, 1979, Fairchild's top management, led by Corrigan, met with representatives of Salomon Brothers and Wachtell Lipton to review Gould's proposal. Legal counsel reviewed with management their responsibilities and those of Fairchild's directors. Counsel expressed a concern that a Gould–Fairchild combination would present significant antitrust problems. Jay Higgins of Salomon Brothers advised management that, on the basis of then available information, Gould's $54 per share offer appeared "inadequate."

Wachtell Lipton and Salomon Brothers agreed that one person in Fairchild should be designated to act as a "clearinghouse" for unsolicited proposals. They advised management that Corrigan should be the contact person. Corrigan expressed himself as unequivocally opposed to Gould's proposal. Corrigan did not like what he

had heard about Gould; and he felt that $54 a share was totally inadequate. He also believed that Fairchild was "on the road" to improved operating results; and that this was not the time to sell the company. Salomon Brothers was authorized to assemble a "white knight book" and to develop a list of potential acceptable acquirors for Fairchild. However, Salomon was not then authorized to make contact with any "white knights."

Nicholas Brady of Dillon Read & Co., Inc. ("Dillon Read"), retained by the Fairchild Foundation, also decided that Gould's proposal of $54 per share was inadequate. He concluded that the exchange of Fairchild stock for Gould stock, in the second phase of the transaction, was a "bad deal" for the Fairchild Foundation. Burke would later take the same position.

On April 28, shortly after the public announcement of Gould's $54 proposal, Rohatyn of Lazard Freres again contacted Gilpatric. For the first time he identified his client as Schlumberger, an oil service company with a strong balance sheet and enormous cash resources. On Rohatyn's suggestion, Gilpatric, with Corrigan's approval, met with Felix Rohatyn and Jean Riboud, chairman and president of Schlumberger, on May 1. The meeting's purpose was limited to determining whether Fairchild would be interested in having Schlumberger "take a look at it," and, if so, to establish guidelines for doing so. The parties agreed to guidelines. (*See infra* section D.) Gilpatric so reported to Fairchild's board at its next meeting.

At Fairchild's May 3 board meeting, attended by all of its directors, Gould's proposal was presented and evaluated in the context of Fairchild's current financial position and its future prospects. Fairchild's projected earnings were compared with its actual 1978 earnings of $4.48 per share. Jay Higgins of Salomon Brothers highlighted a Salomon study, earlier distributed to the directors, that analyzed and compared the financial positions of Fairchild, Gould and selected other semiconductor companies. Higgins' view was that Fairchild's business was "extremely healthy at

present" and that Gould's $54 per share proposal did not represent a ·substantial premium over the industry average. Higgins concluded that Gould's offer was "inadequate," even assuming that the Gould common stock to be exchanged for Fairchild stock in the second step of the proposed merger would have a market value of $54 *and* could be immediately converted into cash.

Bernard Nussbaum of Wachtell Lipton, expressed two major concerns with Gould's proposal: first, that Gould's acquisition of Fairchild might violate antitrust laws; and second, that Gould's conduct prior to making its proposal to Fairchild may not have been in full compliance with federal security laws. He was also concerned over the adequacy of Gould's public disclosure in the context of other Gould acquisitions.

Corrigan summarized management's opposition to Gould on three grounds: (1) that Gould's $54 per share price was inadequate and that Fairchild's future looked good, both near-term and long-term; (2) that a combination with Gould would likely lead Fairchild people to leave the company rather than join up with Gould; and (3) concern that a Gould takeover would have an adverse effect on Fairchild's customers and suppliers. Management's concerns were shared by other directors.

Fairchild's board, following an executive session, voted unanimously to reject Gould's unsolicited merger proposal. The board also determined, on the advice of management as well as Salomon and outside counsel, that it would be inadvisable for Fairchild to have any further discussions with Gould "until [it] had another bidder."

The following day, May 4, at Fairchild's annual meeting, its shareholders reelected all incumbent directors except Louis F. Polk, Jr., who had not been renominated due, in part, to Corrigan's displeasure with Polk's friendship with Ylvisaker.

C.

On May 6, 1979, Gould's board approved an increase in its original proposal offer to $57 per share; and on May 7 Gould so

notified Fairchild. Like its first proposal, Gould's "second proposal" was couched in tentative terms, though this time as a tender offer. Gould stated that its intention was to make a tender offer for up to 2,500,000 shares of Fairchild (46% of Fairchild's then outstanding common) at $57 cash per share. Gould's schedule 14D–1 filing with the Securities and Exchange Commission was worded as a *"proposed form of Offer to Purchase, subject to amendment, modification or revocation* [emphasis added]." As for the "back-end" of Gould's offer, Gould's SEC filing stated:

> If the Purchaser acquires a substantial number of Shares pursuant to the Offer, [Gould] also *presently intend[s]* to propose a tax-free merger of the Company and Gould, the Purchaser or another affiliate of Gould in which shareholders of [Fairchild] other than the Purchaser would receive *shares of Gould Common Stock or other equity securities of Gould* in exchange for their Shares.

(emphasis added) A press release issued by Gould the same day confirmed its intention to make such a tender offer "expected to commence on May 29, 1979 and to expire on June 18, 1979," qualified, as follows:

> If the offer is successful, Gould *presently intends to propose* a tax merger involving Fairchild and Gould or an affiliate of Gould in which the remaining shareholders of Fairchild would receive Gould common stock or other equity securities in exchange for their Fairchild shares.

(emphasis added)

Later the same day, Fairchild's board held a conference call to consider Gould's "second proposal." All directors participated, along with senior officers (including Fairchild's general counsel and its vice presidents of finance and corporate development), Jay Higgins of Salomon Brothers, and Nussbaum and Steinberger, representatives of Wachtell Lipton. Higgins of Salomon Brothers opined that Gould's "second proposal" of $57 per share was inadequate even if it were assumed that the securities offered in a second step would have a value of $57 per share and be immediately convertible into cash. Higgins expressed Salomon's belief that the $57 share price could be improved upon, given sufficient time to negotiate with a third party. Nussbaum continued to voice antitrust and securities regulation concerns. Corrigan reiterated management's view that Fairchild's future was bright and that it was not time to sell or merge the company.

The directors unanimously rejected Gould's second proposal. After the vote, Burke asked to be recorded as objecting not only to Gould's inadequate price but also because over 50% of the price would be payable in Gould stock rather than cash. The board then granted Salomon Brothers permission to distribute its "white knight" book.[6]

### D.

Salomon Brothers "white knight" search was largely in vain. Of the approximately seventy-five companies contacted, only twenty to twenty-five expressed any interest and only a few of them even met with Fairchild. Salomon's white knight book was never delivered to Gould; and Gould apparently never requested it.[7]

---

6. Litigation then followed. On May 8, Gould brought suit against Fairchild in the Federal District Court for the Northern District of Illinois, alleging violations of section 14(e) of the Securities Exchange Act of 1934 as well as other causes of action. On May 9, Fairchild filed suit against Gould in the United States District Court for the Southern District of New York. Fairchild alleged that Gould's conduct in connection with its tender offer violated disclosure requirements of federal securities laws and that the proposed combination with Gould would violate federal antitrust laws. Two days later, Fairchild asked the New York Attorney General to investigate Gould's conduct in the light of the New York Security Takeover Disclosure Act. Fairchild alleged that Gould had manipulated the market in Fairchild's shares prior to announcing its tender offer and had failed to disclose material facts relating to its second step merger proposal with Fairchild.

7. All but two pages of the white knight book consisted of information that was publicly available. The remaining two pages contained projections which were subsequently disclosed in Schlumberger's offer to purchase of May 29.

Corrigan, as well as Gilpatric, made several individual overtures to other companies, as did Brady of Dillon Read, acting on behalf of the Fairchild Foundation. Corrigan attempted to interest General Electric Corporation of Great Britain ("GEC"), a British corporation, and Robert Bosch GmbH, a German corporation, in Fairchild—with little or no success. Bosch had no interest. GEC, which had engaged in a joint venture with Fairchild in England, initially expressed interest. GEC, however, considered the proposed price range too high and the pace of competitive bidding in this country too rapid. GEC suggested, as an alternative, that it buy 25% of Fairchild's outstanding stock to impede a takeover. Corrigan told GEC that any offer would have to be "for the whole company, preferably in cash."

Of all the companies Fairchild representatives contacted, Schlumberger was the only one that expressed serious interest in Fairchild. Following their initial meetings of May 1 and 2 (*see supra* section B), Schlumberger and Fairchild representatives met in a series of follow-up meetings from May 10 through May 16 in New York, Houston (Schlumberger's United States headquarters), and California (Fairchild's headquarters). The meetings, participated in by senior management of both companies, involved extensive exchanges of past, present and projected financial data, assets, liabilities, sales, earnings, and profits.

In the course of these meetings, Rohatyn of Lazard Freres on May 12 telephoned Gilpatric to tell him that Schlumberger "would probably make an offer" for Fairchild. Rohatyn would not be more specific as to terms; but he and Gilpatric did discuss the form in which a transaction might be cast if the parties did reach an agreement. In a memorandum for his file made two days later, Gilpatric summarized Rohatyn's three-step proposal: (1) a firm agreement with the Fairchild Foundation to buy all of its Fairchild stock at the same price to be offered to other Fairchild shareholders; (2) a tender offer to all other Fairchild shareholders; and (3) a follow-up cash-out merger of any remaining Fairchild shares.

Gilpatric suggested, and Rohatyn agreed, that Schlumberger should submit a letter of intent, declaring, among other things: (1) Schlumberger's intent to operate Fairchild as a separate, though wholly-owned, subsidiary of Schlumberger, with Corrigan and present management continuing in control of Fairchild's operation; and (2) Schlumberger's commitment to meet Fairchild's needed additional capital and research and development expenditures. Rohatyn agreed to Gilpatric's conditions.

While the principal officers of both companies were meeting in California and Houston, Rohatyn of Lazard Freres, on May 16 or 17, contacted Higgins of Salomon Brothers. He told him "banker to banker" that Schlumberger's offer would probably be for $62 per share. Higgins responded that $62 would probably be inadequate in light of Fairchild's other likely economic alternatives.

In the three-week period following Gould's proposal of April 25, Corrigan and Higgins had refused to meet with Gould. Corrigan stated that he did so for tactical reasons. He professed fear that open negotiations would chill the interest of other potential bidders. By ignoring Gould, Corrigan hoped Gould would become "an anxious buyer" and that would lead to a higher price. While Higgins had also declined to meet with Gould, he was in frequent contact with Peter Slusser of Paine Webber, Gould's investment banker firm.

### E.

However, Corrigan, on the morning of May 18, at the urging of Gilpatric and Burke, contacted Ylvisaker. Corrigan told Ylvisaker that Fairchild had another bidder *and* that Fairchild was looking for an all-cash offer. Corrigan also told Ylvisaker that Fairchild's board was scheduled to meet the following morning and that Gould should put its *best* and final offer in writing. Ylvisaker assured Corrigan that in a few hours someone from Gould would be in touch with him. Ylvisaker did not request any further information.

When, several hours later on May 18, Fairchild had not received any word from

Gould, Higgins telephoned Slusser of Paine Webber. He recounted essentially what Corrigan had said earlier to Ylvisaker: that other bidders were seriously interested in Fairchild and that Gould should make its best offer before the board met on the 19th. Higgins stressed to Slusser the need for Gould to be *specific* in its terms and conditions, including particularly a description of any securities that were to be involved in any other than an all-cash offer.

By the end of the day, when Fairchild had still not heard from Gould, Higgins again telephoned Slusser. Slusser assured Higgins that a more definitive offer would be forthcoming from Gould that night or the following morning. Slusser also told Higgins that "he hoped to be able to deliver an offer from Gould to acquire Fairchild at $70 a share in cash and securities." When asked by Higgins what terms would make it *worth* $70 per share, Slusser replied that the terms would have to be worked out. Higgins urged Slusser to outline precisely the terms of the offer, the type of security, and any conditions.[8] Slusser promised a comprehensive offer for the board's review.

On May 18, Gould's board of directors approved a revised proposal for Fairchild (hereafter referred to as Gould's "third proposal"). It was cast in the form of a *proposed* conditional cash tender offer to Fairchild's stockholders at $70 per share for up to 2,250,000 shares. Gould's offer was also conditioned on its board's being assured by Gould's counsel and auditors that the term of Gould's outstanding loan agreements would not be violated by such a tender offer.

Higgins received Gould's letter, containing its third proposal,[9] either late on the 18th or early on the 19th. Finding it lacking *any* details on the second tier of the offer, Higgins immediately telephoned Slusser to express surprise at the lack of specifics of the second tier of Gould's offer. According to Higgins' later testimony, Slusser responded that the omission of specifics of the second tier of its proposed tender offer was an "oversight" and that Gould *intended* the "back-end" of its two-stage tender offer to be worth $70 per share. However, Slusser also stated that Gould could not be firm about the specifics of the "back-end" and that Gould assumed that such matters could be negotiated at a later date.[10]

The evening of the 18th, Corrigan and Gilpatric met with Roberts, Riboud and Rohatyn in a meeting that was to last until

---

**8.** At trial Higgins testified to his conversation with Slusser as follows:

And I said, "Okay. But the more you can help me in terms of outlining exactly what you are talking about in terms of any type of security you are offering or any sort of conditions to the entire offer or any part of the offer, that is going to go a long way to allowing the board to eliminate any uncertainty associated with your offer."

He said he understood that and he would have a comprehensive offer for our review sometime before the board meeting.

**9.** The Gould letter signed by Ylvisaker, addressed to Corrigan of Fairchild, dated May 18, 1979, detailed the terms of Gould's tender offer as follows:

Gould (through a subsidiary) would make a tender offer for up to 2,250,000 shares of Fairchild Common Stock at $70 per share in cash. The offer would commence as soon as reasonably practicable after the Memorial Day weekend and would expire 20 days thereafter in accordance with Delaware law. Gould would then propose a merger between Fairchild and Gould or a subsidiary of Gould *in which each*

*remaining share of Fairchild would be exchanged for one share of a new issue of Gould preferred stock, the terms of which would be negotiated by our respective investment banking representatives.* We would also endeavor to work out with you an equitable means of handling your company's outstanding employee stock rights.

In addition to the sources of funds discussed in our previous offer, financial arrangements necessary prior to the commencement of the cash tender offer are expected to be made by the refinancing of Gould's real estate subsidiary, and Gould has been advised by a major institutional lender that such financing can be consummated on May 29, 1979.

(emphasis added). The court noted, "The Gould Board did not take any action approving the terms of a new issuance of preferred stock or a second-step merger."

**10.** Higgins' asserted disclosure to the Fairchild board of Slusser's statement to Higgins of Gould's intentions concerning the value of the back end of Gould's two-tier proposal is not to be found in the minutes of the directors' May 19 meeting. (*See infra* n. 14.)

nearly midnight. Gilpatric viewed his "mission" at the meeting to be "to persuade Schlumberger to make an offer that would be better from the standpoint of the Fairchild shareholders than the [anticipated Gould offer]." Gilpatric's intent was "to try to persuade [Schlumberger] to make an offer of the highest price possible."

When Corrigan and Gilpatric informed Riboud that Fairchild expected to receive a bid from Gould at $70. a share and that Fairchild wanted Schlumberger to better that figure, Riboud exploded. He was furious at being drawn into a bidding contest which he had previously ruled out. Roberts was also irate because he had understood that Fairchild did not want to do a deal with Gould.[11] Gilpatric believed that Schlumberger would not make a higher bid. Therefore, he suggested a price of $68 per share. Schlumberger replied that whatever offer it made would be non-negotiable. The meeting ended acrimoniously without Schlumberger making an offer. However, Rohatyn agreed to telephone Gilpatric the following morning to let him know what Schlumberger intended to do.

After Corrigan and Gilpatric's departure, Riboud, Roberts, and Rohatyn decided that Schlumberger should make an offer; Roberts recommended $62; Riboud though it should be in the low- to mid-sixties; Lazard had recommended $65; and Riboud chose $66. Earlier on May 18, Schlumberger's board had authorized Riboud to negotiate a price in the range of $60 to $70 per share.

None of Fairchild's directors were aware of that authorization.

About 8:00 a.m. the following day, May 19, Rohatyn telephoned Gilpatric to communicate Schlumberger's "non-negotiable" offer for all of Fairchild's five million plus shares for $66 cash. The offer was subject to the following conditions:

(1) rejection of the Gould proposal;
(2) acceptance of Schlumberger's offer by noon that day;
(3) unanimous approval by Fairchild's board; and
(4) execution of an agreement and a joint public announcement before the close of business that day.

Rohatyn told Gilpatric to inform Fairchild's board that Schlumberger would not entertain any negotiations or discussions.[12]

### F.

Fairchild's board meeting, attended by eight of its nine directors, began at 9:00 a.m. on May 19th and lasted nearly three hours. At Corrigan's request, Gilpatric led the board's discussion of the two proposals by outlining the terms of Gould's third proposal and then the terms of the Schlumberger proposal.[13]

Higgins, speaking for Salomon Brothers, criticized Gould's third proposal for failing to value the Gould preferred to be received by Fairchild's shareholders in the second step of the proposed merger. According to the minutes, Higgins had "no explanation"[14] for Gould's failure to include specif-

11. Roberts was not favorably impressed by Fairchild's financial performance. He found Fairchild's performance "much poorer" than those of other companies in the field. His particular concerns were: what he perceived as Fairchild's weakness in the MOS area (a newly-emerging technological development in the semi-conductor industry); Fairchild's strained management relationships; and its inadequate investment in research and development.

12. Gilpatric had been acquainted with Rohatyn for a number of years and had observed Riboud's "continental no-nonsense, no-bargaining, take-it-or-leave-it" style. Gilpatric "believed ... that Schlumberger meant what it said and that it was a take-it-or-leave-it, $66 that day, or Schlumberger was gone." The court found Gilpatric's belief was shared by other Fairchild directors (Burke, Bowers, and Corrigan) and by

Salomon Brothers. The court found the "reasonableness of this belief [was] fully supported by the record."

13. None of the directors were furnished materials to review prior to the meeting. Neither the Schlumberger proposal nor the third Gould proposal was available for delivery before the meeting. A draft letter of intent from Schlumberger and Gould's letter proposal dated May 18 arrived, however, in the course of Gilpatric's presentation.

14. Citron emphasizes the contradiction between Higgins' trial testimony of what he told the board and what the board minutes reflect his statements to have been. Plaintiff points out that the minutes do not reflect that Higgins informed the board of the substance of his follow-up telephone conversation with Slusser

ics of its proposed "back-end" that would confirm its intention that it be valued at $70 per share. While he assumed that continued to be Gould's intention, Higgins advised the board that Gould's proposal was "impossible to value" for lack of specifics of the "back-end" of its proposal. Finally, Higgins pointed out that, assuming the Gould preferred were provided a 9% dividend rate, the dividend requirements alone of the Gould preferred would exceed Fairchild's earnings in its last fiscal year.

Higgins contrasted the uncertainty of Gould's third proposal with Schlumberger's $66 all-cash offer for all shares. He noted that Schlumberger's cash offer represented a substantial premium over the market price of Fairchild stock prior to its recent upsurge. In conclusion, Higgins opined that Schlumberger's $66 all-cash, all-shares offer represented an "adequate" price for Fairchild.[15]

Nussbaum of Wachtell Lipton reiterated his firm's continuing antitrust concerns over a Fairchild–Gould combination. Wachtell Lipton's research showed substantially fewer antitrust concerns as a result of a Fairchild–Schlumberger combination. Finally, he reminded the board of its duty in choosing between the two offers to exercise its sound business judgment in the best interests of Fairchild's stockholders.

Once again, Corrigan expressed management's persistent concerns that the delay inherent in consummating the Gould proposal would have a negative impact on Fairchild's ability to retain many of its key employees, especially technicians. He believed that if these employees left the firm, the value of the second tier of Gould's offer would be substantially less than $70.

Following an executive session, the board voted unanimously to recommend the Schlumberger proposal to the stockholders of Fairchild. The board considered the following, "among other factors," to be important:

1) The opinion of Salomon Brothers that the Schlumberger proposal was adequate and Salomon Brothers' inability to express an opinion either as to the value of the latest Gould proposal or as to whether such proposal was more or less adequate than the Schlumberger proposal due to the uncertainties as to the value and the terms of the proposed Gould preferred stock issue included in such proposal.[16]

2) The opinion of the Wachtell, Lipton firm that the Schlumberger proposal ... did not appear to present antitrust issue of the seriousness involved in the Gould proposal;

3) Fairchild management's judgment that the delay—possibly as much as four months—that would be encountered in consummating the Gould proposal could have a materially adverse effect on Fairchild's operations in the meantime, particularly in the hiring and retention of key personnel.

Later the same day, Schlumberger and Fairchild executed a merger agreement and issued a joint press release, stating that Fairchild would operate as a subsidiary of Schlumberger under its present management and that Schlumberger would continue present or comparable benefit programs.

The following Monday, May 21, Gould issued a press release announcing its withdrawal of both its May 7 second proposal and its May 19 third proposal. Gould did not undertake a competing tender offer, though Fairchild had taken no defensive action which would have precluded or impeded a competing bid by Gould.

---

(presumably earlier that day) and Slusser's assurance that Gould's omission of the specifics of its second tier was an "oversight" and that Gould intended it to have a value of $70 per share.

15. As the court noted:

Higgins regarded "adequacy" and "fairness" as being synonymous: if in an investment

banker's opinion, under better than fire sale conditions, a higher economic alternative could be developed, an offer was, by definition, "inadequate."

16. Salomon Brothers reaffirmed its inability to determine whether the Gould offer was worth more or less than the Schlumberger offer in an opinion letter dated June 7, 1979.

Schlumberger's tender offer began on May 29 and expired on June 18. Approximately 93% of Fairchild's stock was tendered in the tender offer; and the merger of the two companies occurred on September 28, 1979 with the cashing out of Fairchild's remaining shares. Two months later, at Schlumberger's request, Corrigan resigned as president and CEO of Fairchild, though he retained a consultant status for a three-month period.

## II

The central issue in this case is whether the Fairchild board's decision to approve the Schlumberger offer over the Gould proposal was protected by the business judgment rule. A subordinate issue is whether the company was effectively put up for sale, thereby triggering *Revlon* duties; and, if so, whether Fairchild's board dealt fairly with Gould and obtained the highest value for the shareholders. *Revlon, Inc. v. MacAndrews and Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986). Our standard of review of both issues, which are fact dominated, is well settled. We will accept the trial court's findings of fact if they are "supported by the record and are the product of an orderly and logical deductive process." *Levitt v. Bouvier,* Del. Supr., 287 A.2d 671, 673 (1972).

■ The business judgment rule is an extension of the fundamental principle "that the business and affairs of a corporation are managed by and under the direction of its board. *See* 8 *Del.C.* § 141(a)." *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 624 (1984). The rule operates as both a procedural guide for litigants and a substantive rule of law. As a rule of evidence, it creates "a presumption that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984). The presumption initially attaches to a director-approved transaction within a board's conferred or apparent authority in the absence of any evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment." *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 (1988). *See Allaun v. Consolidated Oil Co.,* Del. Ch., 147 A. 257, 261 (1929). The burden falls upon the proponent of a claim to rebut the presumption by introducing evidence either of director self-interest, if not self-dealing, or that the directors either lacked good faith or failed to exercise due care. *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 872 (1985). If the proponent fails to meet her burden of establishing facts rebutting the presumption, the business judgment rule, as a substantive rule of law, will attach to protect the directors and the decisions they make. *Smith v. Van Gorkom* at 873; *see Revlon, Inc. v. MacAndrews & Forbes Holdings,* Del.Supr., 506 A.2d 173, 180 n. 10 (1986), *citing* Hinsey, *Business Judgment and the American Law Institute's Corporate Governance Project: The Rule, the Doctrine and the Reality,* 52 Geo.Wash.L.Rev. 609, 611–13 (1984).

Here, the Chancellor found the contested transaction approved by Fairchild's board on May 19 to be "wholly arms-length" and not a transaction involving either "self-dealing" or a "conspiracy" with Schlumberger. The court further found the board's decision to have been reached by an independent majority of directors who were not dominated by their chairman, Corrigan. Therefore, the business judgment rule attached; and, after a carefully detailed review of the entire record, the court concluded that plaintiff had not overcome that presumption by establishing either that Fairchild's board had acted with gross negligence or in other than a good faith belief that the transaction was in the best interest of Fairchild's shareholders.

On appeal, plaintiff charges that the Court of Chancery erred as a matter of law in finding the business judgment rule to apply to the contested transaction. First, plaintiff obliquely asserts a claim of lack of good faith by Fairchild's board for its alleged failure to act independently of interested management, that is, Corrigan and Burke. Second, plaintiff asserts a claim of lack of due care, contending that the board

was uninformed as to significant aspects of its decision to accept a "lower" Schlumberger offer over a "higher Gould offer." Implicit in this argument is plaintiff's assertion that Fairchild directors "never made a business judgment regarding price" because they never placed a monetary value on Gould's proposal. We address each of these arguments below.

### A.

■ Plaintiff argues that the record required the Chancellor to conclude that Fairchild's outside directors did not act independently of management and were in fact dominated by Corrigan; and that at least one director, Burke, was subject to conflicting loyalties. Plaintiff's claim is premised on essentially three arguable inferences. They are: first, that Corrigan had a "deal" with Riboud guaranteeing a future directorship for Corrigan if Schlumberger prevailed in its offer; second, that Burke's dual role as president of the Sherman Fairchild Foundation and as a member of the Fairchild board of directors made him subject to conflicting loyalties; and third, that Corrigan controlled the board. Plaintiff contends that the outside directors failed to act independently because they: (1) allowed Corrigan to control the sale process through his selection of the investment bankers and attorneys to advise management and the board; (2) failed to establish a functioning independent committee; and (3) failed to exclude Corrigan and Burke from board deliberations on the sale of the company. Plaintiff argues that because the board allied itself with Corrigan and Burke, its members lost the protection of the business judgment rule. The Chancellor found otherwise; and our review of the record compels us to affirm his conclusion that Fairchild's board acted disinterestedly, independently, and in good faith throughout the period of negotiations.

Corrigan did exhibit some animus toward Gould. He considered Gould a "highly centralized monolithic organization" and in-

formed the other directors that he "personally didn't want to be part of such a combination." However, the record supports the Chancellor's finding that Corrigan did not in fact control or dominate the board so as to interfere with the independent exercise of its business judgment. Furthermore, we cannot conclude on the basis of the record that the Chancellor erred in holding that no "deal" existed between Corrigan and Riboud.

On the evening of May 16, Corrigan and Riboud met privately for a short time. While their respective accounts differ as to what occurred at their meeting, the Chancellor found that one clear purpose of the meeting was a discussion of Corrigan's future in a merged Fairchild. Corrigan testified at trial that he had no expectation of continuing as CEO of Fairchild, were Schlumberger to acquire the company. Corrigan testified that his intent in discussing his future was simply to assure Riboud that he, Corrigan, would remain on board for a transition period but would only remain longer if he were made a director of Schlumberger.[17] According to Corrigan, Riboud responded that it was not the appropriate time to discuss such matters, but that the possibility of a directorship "was in the cards."

Riboud had died by the time of trial, but had testified earlier in unrelated litigation on the substance of his meeting with Corrigan. Over plaintiff's objection, the court admitted Riboud's deposition testimony. (*See infra* section III.) Riboud's deposition reveals that Corrigan had requested that the two met on May 16 because of Corrigan's concern for his future, but that Riboud had informed Corrigan that he would not discuss Corrigan's future until an agreement had been reached between the two companies.

While Burke represented one of Fairchild's largest shareholders, this representation alone did not make him an interested director. *See Unocal Corporation v. Mesa*

---

**17.** In a pretrial deposition taken a year earlier, Corrigan had testified somewhat differently. He then stated that Riboud had made a commitment to put him on Schlumberger's board which he later failed to keep, and that prompted Corrigan's resignation after Schlumberger's eventual acquisition of Fairchild.

*Petroleum Co.,* Del.Supr., 493 A.2d 946, 958 (1985); *In re Anderson, Clayton Shareholders Litigation,* Del.Ch., 519 A.2d 680, 687 (1986); *Cheff v. Mathes,* Del.Supr., 199 A.2d 548 (1964). Immediately following Gould's first proposal, Burke and the Fairchild Foundation retained Nicholas Brady of Dillon Read to independently advise the Foundation on the Gould proposal and related matters. There is not a scintilla of evidence that Burke sought, on the Foundation's behalf, more favorable terms for a buy-out of its shares than the shares of the remaining Fairchild stockholders. We find the record evidence relied upon by plaintiff to be wholly insufficient to rebut the presumption that Burke was acting at all times in the best interest of all Fairchild shareholders.

Finally, plaintiff's own failure to name director Gilpatric as a defendant in this suit seriously undermines the plaintiff's contentions that all directors must be treated as one and that Corrigan dominated and controlled the decision-making process of the entire board.[18] The record conclusively establishes that Gilpatric played not simply a lead but a pivotal role in the Fairchild–Schlumberger negotiations from beginning to end.

### B.

■ Plaintiff's second argument against the business judgment rule's application to this case is lack of due care; that is, that Fairchild's board, in accepting Schlumberger's offer over Gould's final proposal, failed to act in an informed manner as required under *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858 (1985). Plaintiff asserts that this case presents our Court with a factual equivalent of *Van Gorkom.* Alternatively, plaintiff argues, Corrigan's attitude toward Gould affected the entire deliberative process of the Fairchild board. Again we find the Chancellor's rulings to the contrary to be clearly supported by the record and correct as a matter of law.

The standard for determining "whether a business judgment reached by a board of directors was an informed one" is gross negligence. *Van Gorkom* at 873. In our case law since *Van Gorkom,* our due care examination has focused on a board's decision-making process. We look for evidence as to whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives. Within the context of this analysis, we are, of course, ever mindful of the realities of corporate directorship. We recognize that management is often the catalyst in the decision-making process. We further recognize that a board will receive substantial information from third-party sources. As we have noted on various occasions, however, in change of control situations, sole reliance on hired experts and management can "taint[ ] the design and execution of the transaction." *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1281 (1988). Thus, we look particularly for evidence of a board's active and direct role in the sale process.

In this case we find ample evidence in the record of the board's involvement. An overriding, and eminently reasonable, concern of the directors was the indefinite nature of Gould's final proposal. Bowers and Stenson believed that Gould's omission of any terms of the second step of the merger was a deliberate tactical maneuver to get rid of Schlumberger. They also believed that Ylvisaker had had more than enough time to propose specific terms and was simply "hedging his bet." Stenson viewed Gould's $70 proposal as not constituting an offer, but simply a "monkey wrench" thrown in by "very savvy" people. He was also concerned about Gould's ability to finance the cash portion of the offer. Burke noted that Gould had been unable two months earlier to complete a private placement of a $125 million preferred stock offering. Burke, Bowers, and Stenson were concerned about Gould's general financial wherewithal, not simply to complete the transaction, but to sustain, after

---

**18.** The final board vote to recommend the Schlumberger offer was a unanimous vote of all directors present at the meeting. One may well wonder how it is that the plaintiff concluded that Gilpatric's vote was not tainted by Corrigan if all other votes were so tainted.

acquisition, Fairchild's capital-intensive semiconductor business. They were especially concerned over Gould's ability to assume Fairchild's substantial debt requirements and that Gould's proposed preferred stock dividend requirement would exceed Fairchild's earnings. Bowers, in particular, expressed serious misgivings over whether Gould's debt undertakings to acquire Fairchild would not breach the terms of Gould's outstanding revolving credit and term loan agreements with its lenders. Under these agreements, Gould was required to maintain certain financial ratios and Gould's ability to issue new securities and dispose of assets required lender approval. In contrast, there was no uncertainty in Schlumberger's offer; Bowers characterized it as "cash on the barrel head" from a company rich in cash resources. All of these are classic factors upon which a board may base a proper business decision to accept or reject a proposal. *Mills Acquisition Co.*, 559 A.2d at 1282, n. 29, and 1285, n. 35; *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334, 1341–42 (1987); *Unocal*, 493 A.2d at 955–56; *Revlon*, 506 A.2d at 182–83.

Plaintiff's attempt to compare this case to *Van Gorkom* is strained and juxtaposes superficial similarities while ignoring crucial differences. In *Van Gorkom*, the chairman of the board, unbeknownst to the other directors, devised a plan to sell the company and picked a sale price based on how long he felt it would take an acquirer to pay back borrowed funds. Neither the chairman nor the board obtained a valuation of the company. After he found a buyer, he called a board meeting to approve a merger—despite the fact that the board had never before considered a sale of the company. *Van Gorkom*, 488 A.2d at 866–67. The Fairchild board, however, had been considering the possibility that the company would be sold for two years prior to receipt of Gould's unsolicited first proposal. The board, also in contrast with the Trans Union board, received investment advice from four leading investment banking firms, commissioned financial evaluations by three of them, shopped the company to roughly 75 potential buyers, and discussed the sale of the company at three separate board meetings over the course of three weeks. The present case is significantly different from *Van Gorkom* and the comparison fails.

■ Concededly, the board ultimately acceded to Schlumberger's three-hour deadline. The Chancellor concluded, however, that the board knew enough as of May 19 concerning the value of the company to make a rational choice with respect to the two offers. In short, he concluded that the board could choose to be rushed in this case. Gilpatric testified:

[The Board] had been addressing ourselves to this issue for nearly two months, over two months, going back to March, and ... had had the benefit of independent expert financial advice [and] legal advice.... I felt we were ready to act, and I recognized we had no choice but to choose one of these ... courses of action on the 19th of May. Otherwise we would have ... lost the Schlumberger offer—we knew that. We were told that flatly, and we believed what we were told. And as far as Gould, Gould had the choice if we didn't accept the offer of going ahead with the tender offer without requiring board action.

The imposition of artificial time limits on the decision-making process of a board of directors may compromise the integrity of that deliberative process. *See Van Gorkom*. However, whether the constraints are self-imposed or attributable to bargaining tactics of an adversary seeking a final resolution to a belabored process must be considered. Boards that have failed to exercise due care are frequently boards that have been rushed. We conclude that the time constraints placed on the Fairchild board were not of the board's making and did not compromise its deliberative process under *Van Gorkom*.

## C.

■ We turn to plaintiff's subordinate argument that the Chancellor erred in his consideration of the plaintiffs' *Revlon* claim. The Chancellor concluded that the

board, "once it became clear that a control transaction would be forced upon the company, acted in good faith to try and arrange and support the transaction that seemed to offer the best option for the Fairchild shareholders." Assuming that *Revlon* strictures apply retroactively to a corporate transaction occurring approximately seven years earlier, *Barkan v. Amsted Industries, Incorporated*, Del.Supr., 567 A.2d 1279 (1989), Walsh, J. (Dec. 18, 1989), slip op. at 1286, n. 2., the trial court's finding that Fairchild's board complied with *Revlon*'s objective is clearly correct as a matter of law. To the extent that *Revlon* instructs a board to obtain the best available transaction for its shareholders, the Fairchild directors complied with *Revlon. Id.* at 182, 185. Gould's failure to submit a firm and unconditional offer precluded a bidding contest foreclosing plaintiffs' reliance on *Revlon.* 506 A.2d at 182, 185.

The actions of Fairchild's board under the circumstances are entirely consonant with well-established Delaware law. We have rejected the thesis that a board of directors should be a passive instrumentality when addressing a takeover bid. *Unocal*, 493 A.2d at 954-55, nn. 8-10; *Revlon*, 506 A.2d at 184, n. 16. *See also Smith v. Van Gorkom*, 488 A.2d at 872. We emphatically restate that principle here. The Fairchild board, actively led by its outside independent directors, had a right, indeed a firm duty, to consider a host of factors in determining whether to entertain Gould's offer. As we have recently said: "Circumstances may dictate that an offer be rebuffed, given the nature and timing of the offer; its legality, feasibility and effect on the corporation and the stockholders; the alternatives available and their effect on the various constituencies, particularly the stockholders; the company's long term strategic plans; and any special factors bearing on stockholder and public interests." *Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261, 1285, n. 35 (1989). *See also Unocal*, 493 A.2d 954-56; *Smith v. Van Gorkom*, 488 A.2d at 872-78.

Furthermore, our law could not be clearer that in assessing the bidder's bid and the bidder's responsibility, the board's unquestioned duty included the obligation to consider "the adequacy and terms of the offer, its fairness and feasibility; the proposed or actual financing for the offer, and the consequences of that financing ... the risk of nonconsumation [sic] ... the bidder's identity, prior background and other business venture experiences; and the bidder's business plans for the corporation and their effects on stockholder interests." *Mills Acquisition Co.*, 559 A.2d at 1282, n. 29.

The record also sustains the Chancellor's findings that Fairchild's board of directors studiously endeavored to avoid "playing favorites," consistent not only with *Revlon* but with any "enhanced" duty which, also six years later, was enunciated under *Unocal Corp. v. Mesa Petroleum Co.*, Del. Supr., 493 A.2d 946, 954 (1985). Fairchild's board did not erect any defensive barriers to prevent a Gould tender offer (*see supra* n. 2; I-F). The record firmly supports the trial court's finding that whatever personal dislike Corrigan had for Gould did not skew the bidding process or influence the board's ultimate decision. Fairchild's bankers were at all relevant times in contact with Gould; and Gould was not deprived of a fair opportunity to formulate and present both a firm proposal and a later counterbid. The facts are: (a) that Corrigan as well as Higgins of Paine Webber timely advised Ylvisaker and Slusser, Gould's financial advisor, of Fairchild's immediate need of a definitive offer; and (b) that Ylvisaker as well as Slusser replied that Fairchild's deadline posed "no problem." Moreover, Higgins affirmatively offered to assist Slusser to provide Gould with any further information needed for it to make a final, best and firm offer. Gould's third proposal fell far short of the mark. Fairchild's board came under no legal duty to give Gould one more opportunity to submit a firm unconditional bid and risk losing the Schlumberger offer. We will not hold a target board of predominantly disinterested directors liable for allegedly failing to exhibit due care when the bidder does not

provide the target board with a definitive bid.

Given our controlling standard of review, we must reject plaintiff's claim that Fairchild's board failed to make a business judgment concerning the value of Gould's proposal because it arguably never placed a monetary value on the indefinite offer. For the reasons stated, we affirm the Court of Chancery's application of the business judgment rule.

## III

■ We take up the first of plaintiff's remaining contentions—that the Court's admission into evidence of a deposition of Jean Riboud under D.R.E. 804(b)(1) and D.R.E. 803(24)[19] was erroneous as a matter of law and prejudicial. Plaintiff strenuously objected at trial to the admission of Riboud's deposition testimony in an unrelated antitrust action without the opportunity to cross-examine the then deceased witness on whether he had made an employment commitment to Corrigan. (*See infra* section II–A.) Because the plaintiff in the antitrust action was not a predecessor in interest of Citron, she asserts that the admissibility of Riboud's testimony was clearly contrary to D.R.E. 804(b)(1). *See* 11 *Moore's Federal Practice* § 804.04[2]. Defendants, as the proponents of the evidence, failed, plaintiff contends, to establish a sufficient factual foundation for the testimony's admission.

Our general standard of review of a trial court's evidentiary rulings is abuse of discretion. However, unless a substantial right of a party is affected by an evidentiary ruling, prejudicial error will not be found. D.R.E. 103(a). The question of the admissibility of Riboud's testimony under D.R.E. 804(b)(1) largely turned upon factual findings concerning the relationships of the parties and the issues in the two actions. The Chancellor found the criteria of D.R.E. 804(b)(1) to have been met and that Riboud's testimony had been taken under circumstances that "offered indicia of reliability." *See* D.R.E. 803(24). Given the court's broad discretion over such matters, we decline to find any abuse of discretion, nor do we find that the admission of Riboud's testimony is a basis for reversible error. Regardless of whether Corrigan had or had not received a commitment from Riboud, the trial court found Corrigan not to have dominated the independent majority of Fairchild's board. (*See infra* sections I and II.)

■ Plaintiff also asserts a claim against Fairchild's directors for breach of their duty of candor to Fairchild's shareholders. Plaintiff's claim is premised on alleged material nondisclosure violations by Schlumberger in its offer to purchase and notice of merger.[20] Plaintiff contends that Fairchild's directors were legally responsible for the contents of Schlumberger's documents transmitted to Fairchild sharehold-

**19.** Delaware Rule of Evidence 804(b)(1) provides:

(1) **Former Testimony.** Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination.

Delaware Rule of Evidence 803(24) provides:

(24) **Other Exceptions.** A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that: (A) The statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the pro-

ponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

**20.** Plaintiff also argues that the present Fairchild corporation, as the successor to Schlumberger, is liable for Schlumberger's knowing participation in the Fairchild board of directors' breach of its fiduciary duty. Because we have not found Fairchild's board to have breached any fiduciary duty, the argument is moot.

ers, even though they were conceded to have been drafted by Schlumberger and not by Fairchild. The Court of Chancery rejected plaintiff's breach of candor claim, finding any alleged disclosure violations not to have been material and, in any event, that Schlumberger came under no fiduciary relationship to Fairchild's shareholders requiring of it a duty of candor. We affirm both rulings as factually supported by the record and otherwise correct as a matter of law.

Under Delaware law, until the conclusion of the tender offer, Schlumberger owed no fiduciary duty of candor to Fairchild's stockholders. "[A] shareholder who owns less than 50% of a corporation's outstanding stocks does not, without more, become a controlling shareholder of that corporation, with a concomitant fiduciary status." *Gilbert v. El Paso Company*, Del.Ch., 490 A.2d 1050, 1055 (1984). For a dominating relationship to exist in the absence of controlling stock ownership, a plaintiff must allege domination by a minority shareholder through actual control of corporate conduct. *Kaplan v. Centex Corporation*, Del. Ch., 284 A.2d 119, 122–23 (1971); *see also In re Sea–Land Corp. Shareholders Litigation*, Del.Ch., C.A. No. 8453, Jacobs, V.C., slip op. at 6–8, 1988 WL 49126 (May 13, 1988).

Similarly, Fairchild's board bore no legal responsibility for alleged nondisclosures in Schlumberger's offer to purchase absent some proof that the two boards engaged in joint conduct to mislead the shareholders. *See Solash v. Telex Corp.*, Del.Ch., C.A. Nos. 9518, 9528, 9525, Allen, C., slip op. at 29–30, 1988 WL 3587 (Jan. 19, 1988); *see also Gilbert v. El Paso Company*, Del.Ch., 490 A.2d 1050 (1984); *Pennmart Realty Company v. Becker*, Del.Ch., 298 A.2d 349 (1972). However, assuming that Fairchild's directors came under any duty of candor to their shareholders, our review of the record confirms the correctness of the Chancellor's related finding. He ruled that any "allegations of nondisclosure relate[d] either to claims that have not been estab-

lished or to items that are not material"; and the record fully supports his findings.

We take up plaintiff's several claims directed to the cash-out phase of the Schlumberger–Fairchild merger. Plaintiff first argues that under *Weinberger v. U.O.P., Inc.*, Del.Supr., 457 A.2d 701 (1983), the defendants bore a burden of establishing the entire fairness of the cash-out merger. Plaintiff misreads our decision in *Weinberger*. In *Weinberger*, we approved the Court of Chancery's conclusion that "the plaintiff in a suit challenging a cash-out merger must allege specific acts of fraud, misrepresentation, or other items of misconduct to demonstrate the unfairness of the merger terms to the minority." *Id.* at 703. In this instance, the plaintiff presented no substantial evidence as to the unfairness of the $66 cash-out merger; thus, *Weinberger* is not applicable.

■ Plaintiff also asserts that the notice of merger was fatally flawed because it failed to disclose to the remaining Fairchild shareholders the results of an appraisal of Fairchild's assets as of July 1, 1979 performed by Valuation Research. The Chancellor ruled that the Valuation Research asset appraisal was not a material omission. He found that the report was based almost entirely on publicly available information and was prepared primarily for accounting purposes rather than for establishing the fair market value of a Fairchild share. Therefore, the court concluded that disclosure of the analysis was not required under the controlling standard of *Rosenblatt v. Getty Oil Company*, Del.Supr., 493 A.2d 929 (1985). Defendants also correctly point out that disclosure of "soft information" of this kind, if now arguably required, was not required in 1979 and, indeed, was discouraged. *Compare South Coast Service Corp. v. Santa Ana Valley Irrigation Co.*, 9th Cir., 669 F.2d 1265 (1982), *with Flynn v. Bass Bros. Enterprises, Inc.*, 3d Cir., 744 F.2d 978 (1984) (cases evidencing the evolving policy of the SEC concerning disclosure of asset valuations and other "soft information").

The question presented is a mixed one of fact and law; and the record supports the trial court's findings on both materiality of

the report and the primary purpose for which it was prepared. Given those findings, the report was not required to be disclosed under *Rosenblatt* since the facts contained therein, if disclosed, would not have altered in a significant way the "total mix" of information otherwise available to the Fairchild shareholders through publicly available documents. *Rosenblatt* at 944–45; *see also In re Anderson, Clayton Shareholders Litigation,* Del.Ch., 519 A.2d 680, 692–93 (1986).

### Conclusion

We conclude that the directors of Fairchild acted in good faith and with due care in recommending Schlumberger, Inc.'s $66 all-cash, all-shares tender offer over Gould, Inc.'s two-tiered offer of cash and securities. Accordingly, the board's decision is entitled to the presumption of the business judgment rule. The Court of Chancery's findings that the plaintiff failed to rebut this presumption are supported by the record and are the product of a logical and deductive reasoning process. Finally, plaintiff's allegations that the directors of Fairchild and the directors of Schlumberger violated their duties of candor toward the Fairchild directors are either unsupported as a matter of law or unsubstantiated in the record.

\*        \*        \*

Affirmed.