# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE SANCHEZ ENERGY DERIVATIVE LITIGATION | ) CONSOLIDATED<br>) C.A. No. 9132-VCG |

## MEMORANDUM OPINION

Date Submitted: August 11, 2014
Date Decided: November 25, 2014

Stuart M. Grant, Michael J. Barry, Nathan A. Cook, Bernard C. Devieux, and Jacob R. Kirkham, of GRANT & EISENHOFER P.A., Wilmington, Delaware, and Pamela S. Tikellis, Scott M. Tucker, Tiffany J. Cramer, and Vera G. Belger, of CHIMICLES & TIKELLIS LLP, Wilmington, Delaware; OF COUNSEL: Mark Lebovitch, Amy Miller, and Evan Berkow, of BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York, Attorneys for the Plaintiffs.

John D. Hendershot and Andrew J. Peach, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, Attorneys for Defendants Gilbert A. Garcia, Alan G. Jackson and Greg Colvin.

Peter B. Ladig, Jason C. Jowers, and Elizabeth A. Powers, of MORRIS JAMES LLP, Wilmington, Delaware; OF COUNSEL: R. Thaddeus Behrens and Daniel H. Gold, of HAYNES & BOONE LLP, Dallas, Texas, Attorneys for Defendants Eduardo Sanchez and Sanchez Resources, LLC.

William M. Laffery, Leslie A. Polizoti, and Lauren K. Neal, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: M. Scott Barnard and Michelle A. Reed, of AKIN GUMP STRAUSS HAUER & FELD LLP, Dallas, Texas, Attorneys for Defendants A.R. Sanchez Jr. and A.R. Sanchez III.

Rolin P. Bissell and Tammy L. Mercer, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Michael C. Holmes and Jeremy M. Reichman, of VINSON & ELKINS LLP, Dallas, Texas, Attorneys for Defendants Altpoint Capital Partners LLC and Altpoint Sanchez Holdings LLC.



Kurt M. Heyman, Patricia L. Enerio, and Dawn Kurtz Crompton, of PROCTOR HEYMAN LLP, Wilmington, Delaware, Attorneys for Nominal Defendant Sanchez Energy Corp.

GLASSCOCK, Vice Chancellor

This case tests the limits of our pleading requirements under Court of Chancery Rule 23.1. The Plaintiffs are stockholders who seek to derivatively pursue claims for breach of fiduciary duty against the corporation, arising from a transaction in which the corporation purchased assets from another entity controlled by two members of the corporation's board of directors. The Plaintiffs did not make a pre-suit demand on the board. The transaction at issue was approved by the corporation's audit committee, which is specifically empowered by the board of directors to review, and approve or reject, such transactions. The audit committee is composed of the three other, disinterested board members, and was assisted by a financial advisor in approving the transaction.

In arguing that demand should be excused, the Plaintiffs point to the conflicted directors' managerial control over the corporation and what they see as the disadvantageous nature of the transaction itself, together with conclusory allegations that two of the three disinterested directors lacked independence. The Complaint is silent about the process by which the audit committee evaluated the transaction, however; indeed, it must be, because the Plaintiffs failed to pursue information about the process, through a demand under Section 220 or otherwise. If the procedural requirements of Rule 23.1 are to be meaningful and effective, more than conclusory allegations of directors' lack of independence is required before control of litigation is shifted from the board to the stockholders.

3

Accordingly, and for the reasons that follow, I grant the Defendants' Motions to Dismiss.

## I. BACKGROUND FACTS

Sanchez Energy Corporation ("Sanchez Energy," or the "Company") is a publicly traded Delaware corporation "focused on the acquisition, exploration, and development of unconventional oil and natural gas resources onshore along the U.S. Gulf Coast."[1] Sanchez Energy was established in 2011 by certain members of the Sanchez family, two of whom—A. R. Sanchez Jr., a 16% stockholder, and A. R. Sanchez III, a 5.5% stockholder—have since served on the Company's board of directors. In addition to Sanchez Jr. and Sanchez III, Sanchez Energy's board of directors consists of individual Defendants Alan G. Jackson, Gilbert A. Garcia, and Greg Colvin.

According to the Plaintiffs, in addition to its minority equity stake in Sanchez Energy, the Sanchez family also owns and operates a "web of four privately held, affiliated companies,"[2] including Sanchez Resources, LLC ("Sanchez Resources"). In 1978, Sanchez Jr. and his father founded Sanchez Oil & Gas Corporation ("SOG"), a company that specializes in managing oil drilling operations; Sanchez Jr. is the CEO and Chairman of SOG, which provides

---

[1] Compl. ¶ 19. Unless otherwise indicated, all facts cited herein are taken from the Plaintiffs' Verified Consolidated Stockholder Derivative Complaint.
[2] *Id.* ¶ 2.

4

management services to all Sanchez-affiliated entities, including Sanchez Energy. Apart from directors, officers, and management services obtained from SOG, Sanchez Energy "has no employees and no directly managed operations."[3] In addition, SOG grants Sanchez Energy "a license to the unrestricted proprietary seismic, geological and geophysical information owned by SOG that is related to the Company's properties."[4] SOG, Sanchez Energy, and Sanchez Resources all operate out of the same building complex in Houston, Texas.

In August 2013, Sanchez Energy entered into a transaction (the "Transaction") with Sanchez Resources for the purchase of "working interests"— rights to develop land and extract oil, subject to royalty payments owed to landowners—in Sanchez Resources' "Tuscaloosa Marine Shale" ("TMS") project. Prior to the Transaction, Sanchez Resources held working interests in 40,000 acres of developed land and 40,000 acres of undeveloped land in the TMS, and Altpoint Capital Partners LLC ("Altpoint") held an unspecified equity stake in Sanchez Resources. When oil reserves were proven on the 40,000 acres of developed land, Sanchez Resources sought to develop the remaining undeveloped acreage, but Altpoint declined to make an additional investment to fund that development. Sanchez Resources and Altpoint therefore sought a third party willing to buy out Altpoint's equity interest and to fund the additional development. Sanchez

---

[3] *Id.*
[4] *Id.* ¶ 40.

Resources and Altpoint found that third party in Sanchez Energy: the Company agreed to purchase Altpoint's working interests in the TMS, but structured the Transaction as a joint venture rather than an equity investment.

The Transaction was structured in three legs: Sanchez Resources transferred its working interests in the 40,000 acres of undeveloped land to Altpoint; Altpoint transferred those same interests to Sanchez Energy; and then Sanchez Energy transferred the interests back to Sanchez Resources, in exchange for an undivided one-half interest in both the 40,000 acres of undeveloped land *and* the 40,000 acres of developed land. As consideration, Sanchez Energy paid roughly $77 million in cash and stock, with approximately $62 million flowing to Altpoint and $15 million flowing to Sanchez Resources. In addition, Sanchez Energy committed to constructing six oil wells on the undeveloped property—a benefit of approximately $22 million to Sanchez Resources, according to the Plaintiffs—and agreed to pay additional royalties to Sanchez Resources on future revenues from oil extracted from the undeveloped property. According to the Plaintiffs, Sanchez Energy's $77 million payment valued the Transaction at approximately seventeen times the value of an August 2013 "comparable arms-length transaction[] in the TMS" between Goodrich Petroleum Corp., the largest acreage owner in the TMS, and Devon Energy, "a true third party."[5] By another of the Plaintiffs' calculations,

---

[5] *Id.* ¶ 52.

Sanchez Energy paid roughly $2,500 per acre for the same working interests that Sanchez Resources had purchased in 2010, prior to development, at $184 per acre.

The Complaint does not detail the parties' negotiations leading up to the Transaction, or even identify which principals at Sanchez Energy negotiated its terms. Defendants Jackson, Garcia, and Colvin, acting as the Company's audit committee (the "Audit Committee")—a committee created for the express purpose of evaluating and approving interested-party transactions between the Company and Sanchez family members[6]—considered and approved the Transaction, with the advice of an independent financial advisor. Although the Complaint contains few specific allegations detailing the Audit Committee's evaluation of the Transaction, the Plaintiffs contend that the members of the Audit Committee lacked independence from Sanchez Jr. and Sanchez III, and that the Committee's approval of the Transaction is therefore not entitled to deference under the business judgment rule. While the Plaintiffs conceded Colvin's independence in briefing

---

[6] The Audit Committee is empowered to evaluate and approve transactions between the Company and Sanchez-affiliated entities by the Audit Committee's Charter, which has been ratified by the Company's board of directors. *See* Transmittal Affidavit of Andrew J. Peach to Opening Br. of Defs.' Gilbert A Garcia, Alan G. Jackson and Greg Colvin in Supp. of their Mot. to Dismiss, Ex. 12 ("Amended and Restated Charter of the Audit Committee of the Board of Directors of Sanchez Energy Corporation") ("The Audit Committee (the 'Committee') is appointed by the Board of Directors (the 'Board') of Sanchez Energy Corporation (the 'Company') to assist the Board in . . . reviewing, and if it so determines, approving related party transactions, including those with Sanchez Oil & Gas Corporation, Sanchez Energy Partners, I and their affiliates (collectively, the 'Sanchez Group')." (emphasis omitted)).

and at oral argument,[7] the Plaintiffs allege that Jackson and Sanchez Jr. "have been close friends for more than five decades," and that "Jackson is beholden to Sanchez Jr. in his professional career."[8] According to the Plaintiffs, Jackson is employed as an executive at IBC Insurance Agency, Ltd. ("IBC"), the subsidiary of International Bancshares Corporation, for which Sanchez Jr. serves as one of nine directors and in which the "Sanchez family"—a group undefined in the Complaint—"are the largest stockholders."[9] The Complaint therefore alleges that:

> If Jackson, in his capacity as a director at Sanchez Energy, were to act against the interests of Sanchez Jr., he faces the threat of termination at IBC, the loss of promotion opportunities, and the loss or decrease of his salary—his very livelihood—because of Sanchez Jr.'s position on IBC's board [sic] and significant influence through his substantial equity stake.[10]

To be clear, the Plaintiffs argue that Jackson would face these negative consequences because of Sanchez Jr.'s position on IBC's *parent company's* board—International Bancshares Corporation—not because of Sanchez Jr.'s position on *IBC*'s board, as their language above suggests. The Complaint does *not* allege, and the Plaintiffs have *not* argued, that Sanchez Jr. also serves directly

---

[7] The Plaintiffs allege in their Complaint that Colvin was "unable to act independently and disinterestedly consider a demand on Sanchez Energy because doing so would jeopardize his personal relationship with the Sanchez family and the considerable compensation received for his service on the Sanchez Energy Board," as his "six-figure salary [from the Company] is a major personal benefit to Colvin, which materially affects his ability to act independently of the Sanchez family." *Id.* ¶ 78. However, the Plaintiffs declined to brief the issue and conceded at oral argument that Colvin did not lack independence.
[8] *Id.* ¶ 75.
[9] *Id.*
[10] *Id.*

on the board of IBC, the subsidiary entity that the Plaintiffs claim employs Jackson as an executive.

In addition, the Plaintiffs allege that "Garcia is unable to independently and disinterestedly consider a demand on Sanchez Energy" due to Garcia's 30-year relationship with the Sanchez family and "the ongoing business relationship between [Garcia-affiliated entities] and Sanchez Jr."[11] The Plaintiffs point out that Garcia and a third party, Sandman Ventures Investments, LLC ("Sandman"), own a respective 39% and 20% equity interest in Latin American Entertainment, LLC. Sanchez Jr. owns 17% of Sandman, and, according to the Complaint, the "Sanchez family" controls Sandman. In addition, the Plaintiffs explain that Garcia owns a 48% equity interest in an entity, Hacienda Records, L.P., in which Sandman is a "preferred limited partner."[12]

On January 28, 2014, the Plaintiffs filed their Verified Consolidated Complaint in this action, asserting Count I for breach of fiduciary duty against all the individual director Defendants; Count II for breach of fiduciary duty against Sanchez III in his capacity as an officer of the Company; Count III for aiding and abetting breaches of fiduciary duty against Sanchez Resources, its principal, Eduardo Sanchez, and Altpoint; and Count IV for unjust enrichment against Sanchez Jr. and Sanchez III. On April 1, 2014, Defendants Garcia, Jackson, and

---

[11] Pls.' Answering Br. at 20–23; Compl. ¶ 76.
[12] *Id.*

Colvin; Sanchez Jr. and Sanchez III; Sanchez Resources and Eduardo Sanchez; and Altpoint separately moved to dismiss. The remainder of this Memorandum Opinion addresses those Motions.

## II. STANDARD OF REVIEW

This action is before me on the Defendants' Motions to Dismiss, pursuant to Court of Chancery Rules 23.1 and 12(b)(6). In evaluating a motion under Rule 12(b)(6), this Court must accept all well-pled allegations as true and draw all reasonable inferences in the plaintiff's favor from those allegations.[13] While this Court will not accept allegations that are merely conclusory, I must deny the motion where a well-pled complaint alleges "any reasonably conceivable set of circumstances susceptible of proof."[14]

Rule 12(b)(6) seeks to eliminate the expense of litigation of meritless claims; Rule 23.1 serves a different purpose. The latter is protective of our corporate model, under which directors, and not the stockholders, run the corporation. In order to permit directors to focus on this task, and at the same time protect the interest of the stockholders, Rule 23.1 requires stockholders who believe that corporate litigation is beneficial to make a demand for such action on the board of directors. Under our case law, the demand requirement under Rule 23(b)(1) is

---

[13] *See, e.g.*, *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *7 (Del. Ch. July 24, 2014).
[14] *Id.*

10

excused only in limited circumstances where demand would be futile. As our

Supreme Court has previously explained:

> Because directors are empowered to manage, or direct the
> management of, the business and affairs of the corporation, the right
> of a stockholder to prosecute a derivative suit is limited to situations
> where the stockholder has demanded that the directors pursue the
> corporate claim and they have wrongfully refused to do so or where
> demand is excused because the directors are incapable of making an
> impartial decision regarding such litigation.[15]

The test for demand futility was set forth in the seminal case of *Aronson v. Lewis*,

where our Supreme Court ruled that a plaintiff who has not made a demand on the

board must plead allegations raising a reasonable doubt that "(1) the directors are

disinterested and independent [or] (2) the challenged transaction was otherwise the

product of a valid exercise of business judgment."[16] In order for demand to be

excused, Rule 23.1 requires the plaintiff to "allege with particularity" the facts

justifying demand futility under one of these two prongs of *Aronson*.[17]

It is notable that the requirement to plead demand futility with particularity

precedes the plaintiff's ability to conduct discovery. This apparent dilemma for

stockholder plaintiffs is relieved in part by Section 220 of the Delaware General

Corporation Law, which permits stockholders to obtain information in order to

properly plead a derivative case. This Court and our Supreme Court have regularly

---

[15] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993) (citation omitted).
[16] 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).
[17] Ct. Ch. R. 23.1(a).

11

cautioned stockholder plaintiffs of the dangers of moving forward with derivative suits without first taking advantage of the informational tools available to them— particularly Section 220—because absent particularized pleadings in satisfaction of Rule 23.1, a proposed derivative claim will be dismissed.[18]

### III. ANALYSIS

Defendants Sanchez Jr. and Sanchez III; Audit Committee members Garcia, Jackson, and Colvin; Sanchez Resources and Eduardo Sanchez; and Altpoint have separately moved to dismiss all counts of the Plaintiffs' Complaint. The Defendants move to dismiss primarily on the basis that the Plaintiffs did not make a demand that the Company bring this derivative litigation, have not adequately pled that such a demand would have been futile and thus is excused, and therefore lack standing to bring the derivative claims asserted in the Complaint. I address those contentions below, concluding that the Plaintiffs have failed to adequately

---

[18] *See, e.g.*, *Rales,* 634 A.2d at 934 n.10 ("Although derivative plaintiffs may believe it is difficult to meet the particularization requirement of *Aronson* because they are not entitled to discovery to assist their compliance with Rule 23.1, they have many avenues available to obtain information bearing on the subject of their claims. . . . [A] stockholder who has met the procedural requirements and has shown a specific purpose may use the summary procedure embodied in 8 *Del. C.* § 220 to investigate the possibility of corporate wrongdoing." (citations omitted)); *Guttman v. Huang*, 823 A.2d 492, 504 (Del. Ch. 2003) ("At oral argument, the plaintiffs also conceded that they had failed to seek [the corporation's] books and records under 8 *Del. C.* § 220. These books and records could have provided the basis for the pleading of particularized facts—*i.e.* for the filing of a complaint that meets the legally required standards. . . . They have thus ignored the repeated admonitions of the Delaware Supreme Court and this court for derivative plaintiffs to proceed deliberately and to use the books and records device to gather the materials necessary to prepare a solid complaint.").

plead demand futility and, accordingly, granting all Motions to Dismiss on that basis.[19]

> A. *The Plaintiffs Have Failed to Adequately Plead Demand Futility Under the First Prong of* Aronson

The Plaintiffs here concede that all three members of the Audit Committee were financially disinterested in the Transaction, and that Defendant Colvin was independent as well.[20] However, as noted above, the Plaintiffs contend that Jackson and Garcia lacked independence from Sanchez Jr. and Sanchez III when evaluating the Transaction. To challenge a director's independence from an interested party, a plaintiff "must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the [person] doing the controlling.' The shorthand shibboleth of 'dominated and controlled directors' is insufficient."[21] In alleging that a director lacked independence from a person with whom the director has had an ongoing relationship, the nature of that relationship must be of a kind that would support a reasonable inference that "the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director."[22]

---

[19] Because I dismiss the Plaintiffs' claims under Rule 23.1, I need not reach the Defendants' Motions to Dismiss under Rule 12(b)(6).

[20] Oral Arg. Tr. 79:1–9.

[21] *Aronson*, 473 A.2d at 816 (citation omitted).

[22] *Beam v. Stewart*, 845 A.2d 1040, 1052 (Del. 2004).

With respect to Jackson's independence, the Plaintiffs allege that "Jackson is a close friend of Sanchez Jr.," and that the two "have been close friends for more than five decades."[23] It is a fact of human nature that close personal relationships can influence decisionmaking, even, in certain circumstances, at the expense of moral and legal strictures such as fiduciary duties. As this Court has explained, however, allegations of personal friendship that do not detail the extent of the friendship are insufficient to support a reasonable inference that a director lacked independence.[24] Other than the allegation that Jackson donated $12,500 to Sanchez Jr.'s Texas gubernatorial campaign in 2002,[25] the Complaint lacks any description of the friendship between Jackson and Sanchez Jr.;[26] I therefore cannot reasonably infer that Jackson lacked independence on that basis.

In addition, the Plaintiffs allege that Jackson is an executive at IBC; that his compensation from IBC is material to him; that Sanchez Jr. is one of *nine* directors on the board of IBC's *parent*; and that Sanchez Jr. "and his family are the largest

---

[23] Compl. ¶ 75.
[24] *See Beam v. Stewart*, 833 A.2d 961, 979 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004) ("Not all friendships, or even most of them, rise to this level and the Court cannot make a reasonable inference that a particular friendship does so without specific factual allegations to support such a conclusion.").
[25] Compl. ¶ 75.
[26] At oral argument for the Defendants' Motions to Dismiss, the Plaintiffs attempted, for the first time, to introduce a newspaper article purporting to detail the close friendship between Sanchez Jr. and Jackson. *See* Oral Arg. Tr. 88:6–89:6. As the Plaintiffs did not include this article in the pleadings or briefing, I find its submission untimely and do not consider it here.

stockholders of [*the parent's*] common stock."[27]  From these facts the Plaintiffs surmise that, if Jackson were to take action as a director of Sanchez Energy against the interests of Sanchez Jr., Jackson would be subjected to "the threat of termination at IBC, the loss of promotion opportunities, and the loss or decrease of his salary—his very livelihood—because of Sanchez Jr.'s position on IBC's board [sic] and significant influence through his substantial equity stake."[28]  The insufficiency of these allegations rests on the Plaintiffs' failure to even attempt to explain how one of nine directors on the board of a parent corporation, owning an undefined equity interest in that company, could exert power to remove an executive in a subsidiary corporation.  Without specific allegations that Sanchez Jr. controlled IBC—or could have otherwise exercised any ability to retaliatorily remove Jackson from his executive position—Jackson's financial interest in continued employment with IBC cannot provide an adequate basis to infer that Jackson lacked independence from Sanchez Jr.  For similar reasons, the Plaintiffs' general allegation that Jackson's director compensation from Sanchez Energy is material to him does not cast doubt on Jackson's independence, as the Plaintiffs conceded at oral argument that neither Sanchez Jr. nor Sanchez III could remove any director from the Sanchez Energy board.[29]

---

[27] Compl. ¶ 75.
[28] *See supra* text accompanying note 10.
[29] *See* Oral Arg. Tr. 89:24–90:5.

With respect to Garcia's independence, the Plaintiffs conceded at oral argument that the personal ties between Garcia and the Sanchez family are even weaker than the personal ties I have just rejected with respect to Jackson;[30] instead, the Plaintiffs focus on Garcia's ongoing and long-term business relationships with the Sanchez family. Specifically, the Plaintiffs allege that Sandman, in which Sanchez Jr. owns a 17% interest and in which other Sanchez family members own a 52% interest, owns a minority position in Latin American Entertainment, LLC and a preferred limited partnership stake in Hacienda Records, L.P., companies in which Garcia holds a respective 39% and 48% interest. However, neither the Plaintiffs' Complaint nor their briefing attempts to explain the significance of these business relationships, and it is not apparent from the allegations in the Complaint why Sanchez Jr.'s minority interest in two companies in which Garcia owns a large equity interest would cause Garcia to abandon his fiduciary duties to favor Sanchez Jr. If the Plaintiffs mean to suggest that Garcia might be influenced by the prospect of future investments with Sanchez Jr., that Garcia might be so grateful to Sanchez Jr. for his investment that he would be willing to breach his fiduciary duties, or that Sanchez Jr. controls Garcia's investments such that he could cause a financial detriment, the Complaint alleges nothing to that effect; nor does the

___

[30] *See id.* at 91:7–13 ("Mr. Garcia has known the Sanchezes, Mr. Sanchez's dad in particular, we've alleged for at least 30 years. Now, it's not the same kind of relationship as Mr. Jackson. Mr. Garcia's relationship appears to have been more professional, more parallel investing in the companies we've identified.").

Complaint explain whether these investments are material to Garcia. Instead, in briefing, the Plaintiffs merely make the conclusory statement that "Plaintiffs have alleged much more than isolated personal or professional relations; Plaintiffs have alleged direct material financial relationships between Garcia and Sanchez Jr."[31] As this Court has often explained, allegations of "a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."[32] Because the Plaintiffs have not attempted to explain how the alleged business relationships between Garcia and Sanchez Jr. could have impacted Garcia's evaluation of the Transaction, I find that the Plaintiffs have failed to adequately plead that Garcia lacked independence.[33]

### B. The Plaintiffs Have Failed to Adequately Plead Demand Futility Under the Second Prong of Aronson

The Plaintiffs also contend that, even if the Audit Committee was disinterested and independent, demand should be excused as futile because the Transaction was "otherwise [not] the product of a valid exercise of business judgment."[34] In support of that contention, the Plaintiffs argue that (1) the Court should evaluate the Transaction under the entire fairness standard, as Sanchez Jr.

---

[31] Pls.' Answering Br. at 22–23.

[32] *Beam v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).

[33] The Plaintiffs likewise make a conclusory allegation that Garcia's compensation as a member of the board of Sanchez Energy is material to him; I reject that argument for the reasons explained above.

[34] *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

17

and Sanchez III should be treated as controlling stockholders, and (2) the Transaction is so facially unfair that it could not possibly have been the product of valid business judgment.

### 1. Sanchez Jr. and Sanchez III Are Not Controlling Stockholders

Sanchez Jr. and Sanchez III, as Sanchez Energy directors with significant equity stakes in Sanchez Resources, concededly stand on both sides of the Transaction in dispute. However, as I have found above, the Transaction was approved by a disinterested, independent Audit Committee. The Plaintiffs nevertheless contend that Sanchez Jr. and Sanchez III are controlling stockholders. According to the Plaintiffs, who cite in support a transcript ruling of this Court,[35] because Sanchez Jr. and Sanchez III exercised actual control over the operations of the Company, the Court should review the terms of the Transaction for entire fairness and excuse demand as futile. The Defendants challenge the Plaintiffs' contention that Sanchez Jr. and Sanchez III are controlling stockholders, and,

---

[35] *See Montgomery v. Erickson Air-Crane, Inc.*, C.A. No. 8784-VCL, at 63:20–64:13 (Del. Ch. Apr. 15, 2014) (TRANSCRIPT) ("[T]his is a case where a controlling stockholder stood on both sides. *Kahn v. Tremont* teaches that when you have these controlling stockholder shuffle situations, entire fairness, as in *Kahn v. Lynch* applies. There were no protective devices used here. Although the independent directors constituted a majority of the Erickson board, they weren't constituted as a separate committee. There wasn't a majority-of-the-minority vote or even, here, a majority-of-the-independent-stockholders vote. Consequently, in the absence of protective devices, this is, at least for pleadings purposes, a full entire fairness case. The second prong of *Aronson* is the operative prong, and under that prong, demand is excused."); *id.* at 72:7–14 ("Because the transaction involves a controller, entire fairness is the standard. Demand is futile under the second prong of *Aronson*.").

18

distinguishing the transcript ruling relied upon by the Plaintiffs,[36] suggest that, even if those Defendants are controllers, where a decision is made by independent, disinterested directors, application of entire fairness to a controlling stockholder transaction does not obviate the need to plead demand futility. I need not reach the latter question of law, however, because I find that the Plaintiffs have not sufficiently pled that Sanchez Jr. and Sanchez III are controlling stockholders.

A board's decision to enter into a transaction with a fiduciary is entitled to the protection of the business judgment rule if that decision is made by disinterested, independent directors.[37] Where a fiduciary is a controlling stockholder, however, she is "required to demonstrate [her] utmost good faith and the most scrupulous inherent fairness of the bargain,"[38] unless the transaction is conditioned *ab initio* on approval by both a disinterested, well-functioning committee of directors and an informed majority of the minority stockholders.[39] To establish that a defendant is a controlling stockholder "[w]hen [that]

---

[36] *See* Reply Br. of Defs. Gilbert A. Garcia, Alan G. Jackson and Greg Colvin in Supp. of Mot. to Dismiss, at 27 n.22 ("Plaintiffs' appeal to the Court's transcript ruling in *Montgomery v. Erickson Air-Crane, Inc.*, . . . fails because the transaction at issue there involved a requirement of stockholder approval (which was given by the controlling holder), and because the directors employed neither a majority-of-independent-stockholders vote nor an approval by an independent committee. The traditional rule, that *either* independent committee approval or disinterested stockholder approval suffices to restore business judgment protection to a transaction tainted by insider interest, was not implicated in *Montgomery*. It is implicated in this case." (citations omitted)).

[37] *See Aronson*, 473 A.2d at 812 ("Thus, if such director interest is present*, and the transaction is not approved by a majority consisting of the disinterested directors*, then the business judgment rule has no application whatever in determining demand futility." (emphasis added)).

[38] *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del. 1983).

[39] *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 642 (Del. 2014).

19

stockholder owns less than 50% of the corporation's outstanding stock, a plaintiff must allege domination by a minority shareholder through actual control of corporate conduct."[40]  This Court has previously explained that actual control of corporate conduct means actual control over the corporation's *board of directors* in the transaction at issue:

> The bare conclusory allegation that a minority stockholder possessed control is insufficient.  Rather, the Complaint must contain well-pled facts showing that the minority stockholder "exercised actual domination and control over . . . [the] *directors*."  That is, under our law, a minority blockholder is not considered to be a controlling stockholder unless it exercises "such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control."  Accordingly, the minority blockholder's power must be "so potent that *independent directors* . . . cannot freely exercise their judgment, fearing retribution" from the controlling minority blockholder.[41]

This view—that minority stockholders are controllers only where they exercise actual control over the board—was recently reaffirmed by Chancellor Bouchard in

*In re KKR Financial Holdings LLC Shareholders Litigation*[42] and Vice Chancellor

---

[40] *In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 664 (Del. Ch. 2013) (quoting *Citron v. Fairchild Camera & Instrument Grp.*, 569 A.2d 53, 70 (Del. 1989)).

[41] *Id.* at 664–65 (alterations in original) (emphasis added) (citations omitted); *see also Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006) ("[T]he focus of the inquiry has been on the *de facto* power of a significant (but less than majority) shareholder, which, when coupled with other factors, gives that shareholder the ability to dominate the corporate decision-making process.  The concern is that the significant shareholder will use its power to obtain (or compel) favorable actions by the board to the ultimate detriment of other shareholders.").

[42] *See* C.A. No. 9210-CB, at 21–22 (Del. Ch. Oct. 14, 2014) (concluding that the minority stockholder, KKR, was not a controlling stockholder of the corporation, KFN, because "[a]lthough [the] allegations demonstrate that KKR, through its affiliate, managed the day-to-day operations of KFN, they do not support a reasonable inference that KKR *controlled the KFN*

Parsons in *In re Crimson Exploration Inc. Stockholders Litigation*.[43] In *Crimson Exploration*, Vice Chancellor Parsons helpfully conducted an extensive survey of Court of Chancery cases—nine in all—that considered controller status for a minority stockholder, with a focus on whether there is any correlation between the size of the minority stockholder's equity stake and its categorization as a controller.[44] After considering the facts of these cases at length, Vice Chancellor Parsons concluded that "the cases do not reveal any sort of linear, sliding-scale approach whereby a larger share percentage makes it substantially more likely that the court will find the stockholder was a controlling stockholder;" rather, "[t]hese cases show that a large blockholder will not be considered a controlling stockholder unless they actually control the board's decision about the challenged transaction."[45] Vice Chancellor Parsons's survey confirms that, although it may take various forms, and thus the controller analysis is highly fact specific,[46] actual board control in the transaction at issue is undoubtedly the defining and necessary feature of a minority controlling stockholder:

---

*board*—which is the operative question under Delaware law—such that the directors of KFN could not freely exercise their judgment in determining whether or not to approve and recommend to the stockholders a merger with KKR").

[43] *See* C.A. No. 8541-VCP, at 39 (Del. Ch. Oct. 24, 2014) ("[T]o adequately plead that a non-majority blockholder was a controlling stockholder, a plaintiff would have to allege facts to show that the blockholder actually controlled the board's decision about the transaction at issue.").

[44] *Id.* at 24–30.

[45] *Id.* at 26, 29.

[46] *Id.* at 26 ("[T]he scatter-plot nature of the holdings highlights the importance and fact-intensive nature of the actual control factor.").

*Lynch* involved a controller who literally dominated the boardroom and threatened a hostile takeover; *Cysive* involved managerial dominance combined with an ability to muster up to 40% of the common stock; and *infoGROUP* involved a potential 37% stockholder, who was the founder and ousted CEO, but remained on the board and allegedly dominated the other directors, who "succumbed to [his] control after being cowed by his threats and hostile, erratic behavior." Absent a significant showing such as was made in these prior cases, the courts have been reluctant to apply the label of controlling stockholder—potentially triggering fiduciary duties—to large, but minority, blockholders.[47]

The Plaintiffs submit that the Complaint pleads sufficient facts to support an inference that, despite their collective 21.5% equity interest in the Company, Sanchez Jr. and Sanchez III together exercise actual control over the operations of Sanchez Energy, and exercised actual control over the terms of the Transaction.[48] In support of that contention, the Plaintiffs allege that "Sanchez Energy is a shell

---

[47] *Id.* at 29–30 (referencing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110 (Del. 1994), *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531 (Del. Ch. 2003), and *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888 (Del. Ch. Oct. 6, 2011), all cases where this Court or the Supreme Court found that a minority stockholder was nonetheless a controlling stockholder in the transaction).

[48] As a preliminary matter, I note that in briefing the Plaintiffs attempt, without elaboration, to cast Sanchez Jr. and Sanchez III as a singular entity for the sake of the controlling stockholder analysis, arguing that "*the Sanchez family* exercises actual control over every aspect of Sanchez Energy's business and operations, including the Transaction, and thus entire fairness applies, thereby excusing demand." Pls.' Answering Br. at 27 (emphasis added). Under our case law, "in appropriate circumstances, multiple stockholders together can constitute a control group, with each of its members being subject to the fiduciary duties of a controller." *In re Crimson Exploration*, C.A. No. 8541-VCP, at 37. In order for the court to aggregate individual stockholders into a single control group, however, "[t]he alleged members of [the] control group . . . must be 'connected in some legally significant way'—such as 'by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal.'" *Id.* (quoting *Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009)). I assume, for purposes of these Motions to Dismiss only, that Sanchez Jr. and Sanchez III should be viewed as a singular entity.

22

company established by the Sanchez family in 2011 to take advantage of public funding" and that "[t]he Company has no employees and no directly managed operations;"[49] that "[d]espite ostensibly giving up voting control of the Company to the public, the Sanchez family retained an equity stake in the Company and firm control over operations and the Board following the IPO;"[50] that Sanchez III "has served as President and CEO of Sanchez Energy and as a member of the Board since the Company's formation in August 2011;" that Sanchez III "is also the President or Managing Director of several privately-held affiliates of Sanchez Energy, including SOG," and, as such, "Sanchez III manages all aspects of [the affiliates'] daily operations, including exploration, production, engineering and land management;"[51] and that SOG provides management services to Sanchez Energy and is located in the same office complex as Sanchez Energy.[52]  In addition, the Plaintiffs cite an Internet "analyst report" stating that:

> In my opinion, Sanchez Energy Corporation for all practical purposes appears to be a complex private financial arrangement by which A. R. Sanchez Jr. is handing over the reins of Sanchez Oil & Gas to his son, A. R. Sanchez, III.  I see no value to public shareholders at this time.[53]

These allegations do not support a reasonable inference that Sanchez Jr. and Sanchez III, individually or in the aggregate, are controlling stockholders, as they

---

[49] Compl. ¶ 2.
[50] *Id.* ¶ 33.
[51] *Id.* ¶ 21.
[52] *Id.* ¶¶ 31, 36.
[53] *Id.* ¶ 37 (quoting Jack Holland, *Sanchez Energy: When an IPO Isn't*, SEEKING ALPHA (Jan. 6, 2012, 4:20 PM), http://seekingalpha.com/article/317985-sanchez-energy-when-an-ipo-isnt).

fail to support a reasonable inference that those Defendants actually controlled the Company's board in the Transaction. The Complaint indicates that Sanchez Jr. and Sanchez III own at most a combined 21.5% stake of Sanchez Energy, and that Sanchez III, as the Company's CEO, has the authority to direct the management of the Company. The Complaint does not suggest, however, that Sanchez III exercises greater control than that typical of a CEO, that he dominates or controls the board, or that he has even attempted to dominate the board through threats, bullying, or the like; instead, the allegations of the Complaint are insufficient to demonstrate that Sanchez Jr. and Sanchez III possess "as a practical matter . . . a combination of stock voting power and managerial authority that enable[d] [them] to control the corporation, if [they] so wishe[d]."[54] Rather, the assertion that Sanchez Jr. and Sanchez III should be treated as a control group is diminished by the Plaintiffs' admission at oral argument that those directors could not exert power to remove a dissenting director.[55] The Complaint alleges that the Sanchez family has managerial control, but not board control, of Sanchez Energy; in fact, nearly 80% of the voting control of the Company is in the hands of independent stockholders, according to the Complaint.

---

[54] *In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 666 (Del. Ch. 2013) (citing *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003)).
[55] Oral Arg. Tr. 89:24–90:5.

In addition, the Plaintiffs' suggestion in briefing that Sanchez III controlled negotiations with Sanchez Resources and Altpoint does not appear in the Complaint, which alleges no details about the Transaction's process, other than to concede that the Audit Committee obtained a fairness opinion and to recite Sanchez III's brief description of the Transaction, *after* it was announced, on an August 8, 2013 Sanchez Energy earnings call. On that call, the Complaint relays, Sanchez III stated:

> The bulk of what ended up being the ultimate purchase price was negotiated between us and the private equity group [Altpoint] that I have previously mentioned. This was a process that took a couple of months as you can imagine we had different views and what it should transact at. We ultimately got to a purchase price of $61 million with them so two-thirds of the answer which is two-third of the purchase price is a function of negotiated price that we agreed to, basically to take them out of this position.[56]

The Plaintiffs highlight this statement as an admission that Sanchez III controlled the negotiation process and strong-armed the deal past the Audit Committee, but that is not a reasonable interpretation. While the Plaintiffs suggest that Sanchez III's references to "us" and "we" refer to his personal participation in the negotiation process, as opposed to that of the Company, they simply do not. Rather, based on the bare allegations of the Complaint, I have no basis to know to what extent anyone—including Sanchez Jr., Sanchez III, or the Audit Committee members—participated in the negotiation process. The Plaintiffs chose not to file

---

[56] Compl. ¶ 55. This quotation from the Complaint appears in its unedited form.

25

a Section 220 demand to uncover documents relating to the negotiation process, and under Rule 23.1 they are not entitled to the inference, based on no alleged facts, that Sanchez III directed the terms of the agreement with Sanchez Resources and Altpoint.

Because I cannot reasonably infer from the allegations of the Complaint that Sanchez Jr. and Sanchez III, individually or in the aggregate, are controlling stockholders, and because the Transaction was approved by disinterested, independent directors, the Plaintiffs' contention that the operative standard of review is entire fairness must be rejected.

### 2. The Transaction Is Not Clearly Unfair

In addition, the Plaintiffs contend that the Transaction is so facially unfair that it could not possibly have been the product of a valid business judgment. The Plaintiffs face a steep uphill battle with this argument. As our Court has repeatedly emphasized, "The second prong of *Aronson* is, for plaintiffs challenging board actions, something of a last resort that, in extreme circumstances, provides the court with the basis to review a transaction despite the appearance of otherwise independent and disinterested fiduciaries."[57]   Recognizing that "substantive

---

[57] *Protas v. Cavanagh*, 2012 WL 1580969, at *9 (Del. Ch. May 4, 2012); *see also Kahn v. Tremont Corp.*, 1994 WL 162613, at *6 (Del. Ch. Apr. 21, 1994) ("The second prong of *Aronson* is, I suppose, directed to extreme cases in which despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review.").

second-guessing of the merits of a business decision . . . is precisely the kind of inquiry that the business judgment rule prohibits,"[58] a plaintiff who challenges the substance of the transaction under the second prong of *Aronson*[59] must plead particularized facts so egregious that they raise a reasonable doubt that the transaction was a course of action "taken honestly and in good faith."[60] This Court has frequently likened this burden to pleading "facts amounting to corporate waste,"[61] where the standard is "whether what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid."[62] Though I am required to apply a standard similar to waste, it is important to note that the Plaintiffs have not actually

---

[58] *In re Dow Chemical Co. Derivative Litig.*, 2010 WL 66769, at *9 (Del. Ch. Jan. 11, 2010).

[59] This as opposed to a plaintiff who challenges whether the directors were adequately informed in their decisionmaking, which is also available under the second prong of *Aronson* and is measured by a standard of gross negligence. *See Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000) ("Pre-suit demand will be excused in a derivative suit only if . . . the particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decisionmaking process, *measured by standards of gross negligence*, included consideration of all material information reasonably available."). Having failed to make a demand under Section 220, the Plaintiffs have no basis to make such an accusation here.

[60] *Protas*, 2012 WL 1580969, at *9; *see also In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003) ("Thus, plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt the board was adequately informed in making the decision.").

[61] *Protas*, 2012 WL 1580969, at *9; *see also Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *9 (Del. Ch. Oct. 10, 2006) ("The burden is on the party challenging the decision to establish facts rebutting the [business judgment rule] presumption; typically such showing of facts must be tantamount to corporate waste to satisfy the second prong of the demand futility analysis." (citations omitted)); *Kahn v. Tremont*, 1994 WL 162613, at *6 (Del. Ch. Apr. 21, 1994) ("The test for this second [prong of *Aronson*] is thus necessarily high, similar to the legal test for waste.").

[62] *E.g.*, *Saxe v. Brady*, 184 A.2d 602, 486 (Del. Ch. 1962).

27

alleged waste, and in fact cannot because this was a value-for-value transaction.[63]

Nonetheless, in briefing, the Plaintiffs argue that they easily clear the high hurdle embodied in the second prong of *Aronson*:

> [D]emand is also excused under the second prong of *Aronson* because the Complaint's particularized allegations give rise to claims that the Defendants acted disloyally by causing the Company to acquire assets from the Sanchez family at a staggeringly unfair price, following an unfair process, and then brazenly lied to their own stockholders by failing to disclose the Sanchez family's full financial interest in the Transaction.[64]

The Plaintiffs point to four factors in support of their contention. First, the Plaintiffs suggest that "Sanchez Energy paid a staggering 17 times the market price to acquire undeveloped properties from Sanchez Resources."[65] The Plaintiffs argue that I can reasonably infer from the Complaint that the terms of the deal were grossly unfair based on the allegation that Sanchez Energy purchased its working interests for roughly $2,500 per acre, considering Sanchez Resources paid only $184 per acre for those same interests several years prior. The Plaintiffs fail to acknowledge, however, that of the total 80,000 acres purchased for $184 per acre, 40,000 acres *are now developed and contain proven oil reserves*. Without an

---

[63] *See, e.g.*, *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997) ("Most often the claim [of waste] is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift. If, however, there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky.").

[64] Pls.' Answering Br. at 30.

[65] *Id.* at 1.

explanation of the level of risk, as well as market conditions, reflected in the original purchase price, compared to that reflected in the Transaction price, I have no basis to infer that the consideration paid in the Transaction was grossly unfair.[66]

Second, the Plaintiffs point to a third-party transaction in the TMS in which working interests were recently purchased for significantly less than the consideration paid in the Transaction. The Plaintiffs allege that:

> In August 2013, Goodrich Petroleum Corp. ("Goodrich"), the largest acreage owner in the TMS, acquired a 172,000 acre working interest in the TMS from Devon Energy. According to the November 10, 2013, WSJ article, Goodrich paid only $144 per acre for working interests in land virtually next door to the Sanchez Energy [acreage]. Thus, Sanchez Energy agreed to pay roughly 17 times more per similarly situated acre to Sanchez Resources than Goodrich did in a true third party deal.[67]

As is evident from those allegations, the Plaintiffs do not describe the Goodrich transaction with details that could provide a basis to infer that the transaction was in fact comparable to the Transaction at issue here. The Complaint lacks sufficient information about the nature, quality, and duration of the Goodrich working interests to allow a meaningful comparison to those acquired by Sanchez Energy.

Third, the Plaintiffs explain that, when the working interests on 40,000 acres of undeveloped land were transferred to Altpoint, Altpoint agreed to an increased

---

[66] I assume that mineral leases of land without developable resources turn out to be virtually worthless, and that mineral leases of land with developable resources have value based on the value of the resources to be obtained; the Complaint provides no basis to infer the value of the leases on the developed acreage.

[67] Compl. ¶ 52.

29

royalty payment. While prior leases required a payment of between 12% and 16% in royalties to landowners, the parties at that time increased those royalties to 25%, with the overage due to Sanchez Resources; when Altpoint transferred those interests to Sanchez Energy, Sanchez Energy assumed the increased royalty obligations. While the Defendants suggest that the increased royalty payments are simply a way the parties agreed to structure the consideration paid in the Transaction, the Plaintiffs argue that the Company's Form 8-K describing the Transaction "omitted exhibits to the Purchase Agreement containing references to the 25% royalty payments,"[68] demonstrating, according to the Plaintiffs, that the Defendants intended to hide the royalty payments from the stockholders, and that the directors who approved those payments acted in bad faith. Despite the Plaintiffs' suggestion of a nefarious motive on the part of the Defendants in obscuring the full consideration paid in the Transaction by increasing royalty payments owed to Sanchez Resources, the allegations of the Complaint provide no basis to infer such a motive on the part of the otherwise independent, disinterested directors who approved the Transaction.

Finally, the Plaintiffs point to statements made by Sanchez III on an earnings call indicating that the price Sanchez Energy paid in the Transaction "was not purely a function of the market value of the subject acreage in an arm's-length

---

[68] Pls.' Answering Br. at 16.

negotiation, but was based primarily on the price it would take to 'take [Altpoint] out' of their stake in Sanchez Resources."[69] The Plaintiffs therefore argue that "buying out Altpoint Capital from its investments in Sanchez Resources may have been a priority for the Sanchez family, but was not a legitimate business objective for Sanchez Energy."[70] That Sanchez III acknowledged Altpoint would not agree to transfer its stake in the working interests unless it could be bought out at a certain price does not demonstrate bad faith, but rather a realistic assessment of the goals of the negotiating parties.

### C. The Plaintiffs' Claims Are Dismissed

As noted above, the Plaintiffs' Complaint asserts counts for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment. These claims belong to the Company, and because the Plaintiffs have failed to bring a demand on the Company or adequately plead demand futility, the claims must be dismissed.

## IV. CONCLUSION

The stockholder Plaintiffs seek to litigate alleged breaches of fiduciary duty involving a deal between the Company and Sanchez Resources, but they failed to make a demand on the Company's board. In order to excuse this failure, they point to friendships and business interests between the disinterested directors and the

---

[69] *Id.* at 32 n.14 (emphasis omitted).
[70] *Id.*

Sanchez family, but without the specificity needed to imply control. The Plaintiffs allege that the Sanchez family, owners of about one-fifth of the Company stock, controls the board of directors, but fail to allege facts to demonstrate that as well. Finally, the Plaintiffs point to what they contend is the one-sided nature of the transaction itself, but attempt to demonstrate this by comparing the price of working interests in land without developed oil resources to the price of working interests in land subject to this deal, half of which has proven reserves. Because the Complaint fails to specifically plead facts excusing demand, it fails to satisfy Rule 23.1. For the foregoing reasons, the Defendants' Motions to Dismiss are GRANTED. An appropriate Order accompanies this Memorandum Opinion.