# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| P&TI ACQUISITION COMPANY, INC. | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. NO.: N18C-08-059 AML CCLD |
| MORGENTHALER PARTNERS VII, LP; and MORGENTHALER MANAGEMENT PARTNERS VII, LLC | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Submitted: February 1, 2019
Decided: May 9, 2019

**Upon Defendants' Motion to Dismiss: Granted**

## <u>MEMORANDUM OPINION</u>

David A. Dorey, Esquire, Craig N. Haring, Esquire, of BLANK ROME LLP, Wilmington, Delaware, Steven J. Roman, Esquire, Adrien C. Pickard, Esquire, of BLANK ROME LLP, Washington, D.C., *Attorneys for* Plaintiff.

Timothy Jay Houseal, Esquire, Jennifer M. Kinkus, Esquire of YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware, and Robert S. Faxon, Esquire, Michael A. Platt, Esquire of JONES DAY, Cleveland, Ohio, *Attorneys for* Defendant.

**LeGrow, J.**

In February 2012, Defendants and others sold a company to Plaintiff and executed a stock purchase agreement governing the sale. The stock purchase agreement precluded Defendants or their affiliates from soliciting or employing any of the acquired company's employees for a period of five years. Plaintiff contends that shortly after the stock purchase agreement's execution, Defendants' affiliates formed a new entity and solicted two key executives from the acquired company in violation of the stock purchase agreement. Plaintiff brought this suit for breach of contract and breach of the implied covenant of good faith and fair dealing. Moving Defendants contend all claims should be dismissed for failure to state a claim.

The pending motion presents two questions: (i) whether Plaintiff adequately pleaded that Defendants and the newly-formed entity commonly are controlled by an individual who holds minority ownership interests and some level of managerial authority at both entities, and (ii) whether Plaintiff has pleaded a claim for breach of the implied covenant of good faith and fair dealing when the non-solicitation clause in the stock purchase agreement directly addresses what individuals or entities are precluded from soliciting the company's personnel.

Here, Plaintiff has not sufficiently pleaded that an individual or "control group" commonly controls both Defendants and the newly-formed entity. Defendants and the newly-formed entity therefore are not affiliates under the terms

1

of the stock purchase agreement, and Plaintiff's breach of contract claim must be dismissed. Additionally, the complaint fails to state a claim that Defendants breached the implied covenant of good faith and fair dealing because the stock purchase agreement directly addresses the conduct at issue.

## FACTS AND PROCEDURAL BACKGROUND

The following facts are drawn from the complaint and the relevant entities' governing documents incorporated by reference therein.

### The Stock Purchase Agreement

In 2012, Plaintiff P&TI Acquisition Company, Inc. ("Plaintiff") purchased PhilTem Holdings, Inc. ("PhilTem"), along with PhilTem's subsidiary, Phillips & Temro Industries, Inc. ("Phillips") from Defendant Morgenthaler Partners VII, LP ("Fund VII"), represented by its general partner, Defendant Morgenthaler Management Partners, VII, LLC ("Management VII") (collectively with Fund VII, "Defendants"). The parties executed a Stock Purchase Agreement (the "SPA") on February 9, 2012. The SPA includes a non-solicitation clause (the "Non-Solicitation Clause") that specifically provides:

> During the Restricted Period, [Defendants] will not, and will cause each of his, her or its Affiliates not to, directly or indirectly, as employee, agent, consultant, director, equityholder, manager, co partner or in any other capacity without the prior written consent of [Plaintiff], employ, hire, engage, recruit or solicit for employment or engagement . . . any Person who is (or was during the one year period

2

preceding the Closing Date) employed or engaged by [PhilTem or its subsidiaries] . . . .[1]

The Non-Solicitation Clause prohibited Defendants and their "Affiliates" from directly or indirectly soliciting or employing any of PhilTem's or Phillips's employees before February 2017. The SPA defines an "Affiliate" as "any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person."[2] Additionally, the SPA defines "Control" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise."[3]

**The Alleged Solicitation of Phillips Executives**

At the time the parties entered the SPA, Harry Sumpter was Phillips's CEO and Michael Ramsay was Phillips's CFO. Plaintiff alleges that in 2014 the Defendants, through their affiliate MPE Partners, LP ("MPE"), began soliciting Sumpter and Ramsay for various positions with MPE or one of its portfolio companies. Specifically, Plaintiff alleges Defendants began soliciting Sumpter to act as an acquisition consultant for MPE, a board member of dlhBOWLES (an MPE portfolio company), or a senior advisor to MPE. Additionally, Plaintiff avers Defendants began recruiting Ramsay to take a position as CFO of a company MPE

---

[1] Defs.' Mot. to Dismiss, Ex. 1 § 5.19(d) [hereinafter "SPA"].
[2] SPA at 2.
[3] *Id.*

3

planned to acquire. In 2015, MPE acquired Bowles Fluidics Corporation and DLH Industries, and Sumpter took a position on the Bowles Fluidics board of directors. Those entities merged to form dlhBOWLES, and in July 2015, Ramsay took a position as dlhBOWLES's CFO. Also in 2015, Sumpter began working as a senior advisor for MPE. Plaintiff claims MPE is Defendants' "Affiliate" under the SPA because MPE and Defendants commonly are controlled by the same individuals. Plaintiff therefore contends Sumpter and Ramsay's solicitation, recruitment, and employment by MPE before February 2017 violated the Non-Solicitation Clause.

On August 6, 2018, Plaintiff filed a two-count complaint (the "Complaint") for breach of contract and breach of the implied covenant of good faith and fair dealing against Defendants. Defendants moved to dismiss the Complaint under Superior Court Civil Rule 12(b)(6), arguing Defendants are not MPE's "Affiliates" under the SPA and therefore did not violate the Non-Solicitation Clause.

**The Relevant Entities' Structure and Ownership**

In the Complaint, Plaintiff relies on the entities' organizational documents to prove that MPE and Defendants commonly are controlled.[4] Plaintiff's theory, repeatedly restated in the Complaint, is that Fund VII, Management VII, MPE, and dlhBOWLES "are under the common control of Taft, Tuleta, Machado, Yohe and

---

[4] Plaintiff agreed at oral argument that the entities' organizational documents are incorporated by reference in the Complaint.

4

others . . . ."[5] A brief discussion of the relevant entities' structure and ownership therefore is necessary.

## A. The Morgenthaler Defendants – Fund VII and Management VII

Defendant Fund VII is a limited partnership and Defendant Management VII is Fund VII's general partner.[6] Management VII manages and controls all Fund VII's business decisions.[7] Management VII has Class A, B, and C members, but only Class A members have management rights. Peter Taft and seven other individuals are Management VII's Class A members. The Class A members have the power to "carry out any and all of the objects and purposes of [Management VII]" and enter into contracts on Management VII's behalf, but only in accordance with "policies established by a [m]ajority of the [m]embers."[8] Management VII's board of managers are the same eight Class A members and make decisions by majority vote. The Board of Managers' role is limited to performing specific organizational tasks, such as determining contribution amounts, admitting additional members, valuing assets, and making distributions.[9] Eight different individuals therefore manage and control Management VII, and in turn, manage and control Fund VII. Between his Class A and B units, Taft controls 9.5628% of

---

[5] Compl. ¶ 44. *See also id.* ¶¶ 45-46, 51, 67, 69, 79-81, 83, 101.
[6] Defs.' Mot. to Dismiss, Ex. 2 § 1.5 [hereinafter "Fund VII Partnership Agreement"].
[7] Fund VII Partnership Agreement § 5.1.
[8] Defs.' Mot. to Dismiss, Ex. 3 § 5.1(d) [hereinafter "Management VII Operating Agreement"].
[9] Management VII Operating Agreement §§ 3.1, 3.4, 4.1, 4.4. *See also id.* § 7.1 (power to designate and remove officers), § 9.2 (power to wind-up the affairs of the company upon dissolution or liquidation).

Management VII's voting interests. Karen Tuleta is one of more than twenty Class B members and owns 0.1483% of the Class B units.

**B. MPE**

Peter Taft, Karen Tuleta, Joseph Machado, Matt Yohe, and others formed MPE in April 2012. Some or all those individuals previously held roles at Fund VII or Management VII. MPE GP, LLC ("MPE General Partner") is MPE's general partner and manages and controls all MPE's business decisions.[10] MPE also has limited partners who do not participate in MPE's management.[11] Taft, Tuleta, Machado, and Yohe do not hold any individual interest in MPE. MPE General Partner has Class A and Class B members, and Taft, Tuleta, Machado, and Yohe are among the individuals holding Class A and B units. No individual owns a majority of the units. Six other individuals or entities also own Class A units. Taft, Tuleta, and Machado are MPE General Partner's three officers, who are subject to the supervision of MPE General Partner's manager.[12] MPE General Partner delegates the authority to make business decisions to its manager, MPE Mgt. Co., LLC ("MPE Management").[13] MPE General Partner's LLC agreement allows any MPE Management member to execute documents on MPE General

---

[10] Defs.' Mot. to Dismiss, Ex. 4 §§ 1.6, 2.1 [hereinafter "MPE Partnership Agreement"].
[11] MPE Partnership Agreement § 5.1.
[12] Defs.' Mot. to Dismiss, Ex. 5 § 6.8 [hereinafter "MPE General Partner LLC Agreement"].
[13] MPE Partnership Agreement § 3.1; MPE General Partner LLC Agreement §§ 1.49, 6.1-6.2, 6.4.

Partner's behalf, but subject to the terms of MPE Management's LLC agreement.[14] According to MPE Management's LLC agreement, all MPE Management's business decisions must be made by a unanimous vote of the board of managers.[15] Taft, Tuleta, and Machado comprise the board of managers and also are one-third members of MPE Management.

In summary, Defendants themselves do not hold any ownership interest or managerial power in MPE or vice versa. Peter Taft and Karen Tuleta are the only individuals with any ownership interest in both Defendants and MPE. Taft is the only individual with any managerial authority at all the relevant entities. Taft, however, is only one of eight individuals with control over Defendants and one of three individuals with control over MPE.

**The Parties' Contentions**

In their motion to dismiss, Defendants contend they did not breach the Non-Solicitation Clause because they are not MPE's "Affiliates" within the meaning of the SPA. Defendants argue the organizational documents demonstrate that Defendants and MPE have separate entity structures and Defendants have no ownership interest in MPE, controlling or otherwise. According to Defendants, the Complaint also fails sufficiently to plead that some person or entity commonly

---

[14] MPE General Partner LLC Agreement § 6.5.
[15] Defs.' Mot. to Dismiss, Ex. 6 §§ 6.1(a), 6.5(b), 7.2 [hereinafter "MPE Management LLC Agreement"].

7

controls MPE and Defendants. Defendants do not dispute that Plaintiff otherwise has pleaded a breach of contract claim, but Defendants contend the failure to sufficiently plead control is fatal to that claim. Defendants further argue the Court should dismiss Plaintiff's implied covenant claim because the contract's express terms govern the conduct at issue.

In response to Defendants' motion, Plaintiff argues it sufficiently has alleged facts permitting a reasonable inference that Taft, Tuleta, Machado, Yohe, and others control both Defendants and MPE. Plaintiff contends the issue of control is a fact-intensive inquiry that cannot be resolved on a motion to dismiss, and Plaintiff therefore is entitled to proceed to discovery to further explore this issue. Finally, Plaintiff argues Defendants breached the implied covenant because their conduct "frustrated the central purpose" of the Non-Solicitation Clause.

## ANALYSIS

On a motion to dismiss, the Court must determine whether the "plaintiff 'may recover under any reasonably conceivable set of circumstances susceptible of proof.'"[16] "If [the plaintiff] may recover, the motion must be denied."[17] A court may grant the motion if "it appears to a reasonable certainty that under no state of facts which could be proved to support the claim asserted would plaintiff be

---

[16] *Holmes v. D'Elia*, 2015 WL 8480150, at \*2 (Del. Dec. 8, 2015) (quoting *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978)).

[17] *Deuley v. DynCorp Int'l, Inc.*, 2010 WL 704895, at \*3 (Del. Super. Feb. 26, 2010) (citing *Parlin v. DynCorp Int'l, Inc.*, 2009 WL 3636756, at \*1 (Del. Super. Sept. 30, 2009) (quoting *Spence*, 396 A.2d at 968)), *aff'd*, 8 A.3d 1156 (Del. 2010).

8

entitled to relief."[18] When applying this standard, the Court will accept as true all non-conclusory, well-pleaded allegations.[19] In addition, "a trial court must draw all reasonable factual inferences in favor of the party opposing the motion."[20] The Court, however, is not required to accept every "strained interpretation of the allegations proposed by the plaintiff" and "a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law."[21]

### A. Because no individual or entity owns a majority interest in Defendants and MPE, Plaintiff must plead that one or more individuals dominates or controls those entities with voting or managerial power that effectively precludes the other managers or members from acting independently.

Plaintiff's breach of contract claim turns on whether some individual or entity commonly controls Defendants and MPE. The SPA defines "Control" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise."[22] The parties agree this contractual

---

[18] *Fish Eng'g Corp. v. Hutchinson*, 162 A.2d 722, 724 (Del. 1960) (citing *Danby v. Osteopathic Hosp. Ass'n of Del.*, 101 A.2d 308, 315 (Del. Ch. 1953), *aff'd*, 104 A.2d 903 (Del. 1954)); *Nero v. Littleton*, 1998 WL 229526, at *3 (Del. Ch. Apr. 30, 1998).
[19] *Pfeffer v. Redstone*, 965 A.2d 676, 683 (Del. 2009).
[20] *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005) (citing *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998) (citing *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del. 1996)) (other citations omitted)).
[21] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).
[22] SPA at 2.

definition effectively adopts the meaning of control Delaware courts apply when deciding whether a corporation has a controlling stockholder.

Under Delaware law, a controlling stockholder exists when "(1) [the stockholder] owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but 'exercises control over the business affairs of the corporation.'"[23] If the stockholder does not own more than 50% of the voting power, the complaint must contain well-pleaded facts showing the minority stockholder "exercised actual domination and control over . . . [the] directors" and the minority controller's power must be "so potent that independent directors . . . cannot freely exercise their judgment."[24] Allegations suggesting the purported controller has power over day-to-day management are not enough; the plaintiff also must allege facts to support a reasonable inference that the individual controls the board of directors or an equivalent governing body.[25] The alleged control may exist over the entire entity or over a specific challenged transaction.[26] Although control ultimately is a factual issue that can be difficult to

---

[23] *In re Tesla Motors, Inc. Stockholder Litigation*, 2018 WL 1560293, at *12 (Del. Ch. Mar. 28, 2018) (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994)).

[24] *In re Morton's Restaurant Group, Inc. Shareholders Litigation*, 74 A.3d 656, 664-665 (Del. Ch. 2013).

[25] *In re KKR Financial Holdings LLC Shareholder Litigation*, 101 A.3d 980, 993-995 (Del. Ch. 2014).

[26] *In re Western Nat'l Corp. Shareholders Litigation*, 2000 WL 710192, at *20 (Del. Ch. May 22, 2000).

resolve on the pleadings, the Court will dismiss the Complaint if the well-pleaded allegations do not permit a reasonable inference of control.[27]

At oral argument, Plaintiff acknowledged that the Court must apply the applicable pleading standard under Superior Court Civil Rule 12(b)(6) and Delaware precedent examining control. Plaintiff noted, however, that most of the cases the parties cited involved corporations subject to public disclosure requirements, and the plaintiffs in those cases therefore had access to substantially more information regarding control, individual relationships, and the internal workings of the companies at issue. The Defendants in this case, on the other hand, are private entities, and Plaintiff therefore contends it is unreasonable to expect more detailed allegations without an opportunity for discovery.

The Court rejects the principle that the pleading standard for control differs depending on whether an entity is public or private. A pleading standard that varied based on an entity's status as public or private would be arbitrary and unworkable. For example, even Plaintiff conceded at oral argument that the depth of companies' public filings greatly differs. Plaintiff's proposed pleading standard effectively would require the Court to measure the specificity of a company's public filings before deciding whether the complaint sufficiently pleaded a claim. In short, it is axiomatic that Plaintiff must meet the existing pleading standard for

---

[27] *Tesla*, 2018 WL 1560293, at *13; *Morton's Restaurant Group*, 74 A.3d 656.

11

control under Rule 12(b)(6) and sufficiently state a claim before being given an opportunity for discovery.[28]

## B. Plaintiff has not sufficiently pleaded that Defendants and MPE are under common control.

Taft is the only individual with any power to direct or cause the direction of both Defendants' and MPE's management and policies. Although the Complaint mentions Tuleta, Machado, Yohe, and unnamed "others," Taft was the focus of Plaintiff's briefing and argument. Plaintiff sufficiently must plead that Taft either (1) has more than 50% of the voting control over both entities, or (2) has less than 50% of the voting control, but nonetheless dominates and controls those entities' governing bodies.[29]

Plaintiff concedes that Taft does not hold more than 50% of any entity's voting control. Taft holds 9.5628% of Management VII's voting control and is one of eight managing Class A members. He likewise owns a one-third interest in MPE Management and does not own (i) a majority of the voting control at MPE General Partner or (ii) any individual interest in MPE.

In order to plead that MPE and Defendants are "Affiliates," Plaintiff's burden therefore is to allege sufficient facts demonstrating Taft exercises

---

[28] Moreover, Plaintiff's suggestion that it cannot effectively plead control before obtaining discovery ignores that Plaintiff already had the benefit of some discovery in an arbitration proceeding with one of the solicited employees.
[29] *Tesla*, 2018 WL 1560293, at *12 (citing *Kahn*, 638 A.2d at 1113-14).

12

domination and control over both entities' governing bodies.[30]   According to Plaintiff, it has met this burden by alleging Taft holds "various positions of managerial and executive power" and has the power to "(1) enter into contracts, (2) buy, sell, exchange, transfer or acquire investments, (3) provide guarantees and (4) exercise, terminate, amend, waive or otherwise change the rights of [Fund VII]."[31] Further, Plaintiff argues it has pleaded "detailed facts regarding Taft, Tuleta and Machado's managerial and directorial control over MPE, including through its manager, [MPE Management]."[32]

Here, the Complaint does not contain well-pleaded facts permitting an inference that Taft dominates and controls either MPE or Defendants, let alone both MPE and Defendants.  Plaintiff does not offer anything more than conclusory allegations of Taft's control while seeking inferences contradicted by the relevant entities' governing documents.

---

[30] The parties dispute whether Plaintiff must plead "actual control" or simply "potential control." *See Tesla*, 2018 WL 1560293, at *13 n.215 (quoting *In re Zhongpin Inc. Stockholders Litigation*, 2014 WL 6735457, at *7 (Del. Ch. Nov. 26, 2014), *rev'd on other grounds*, *In re Cornerstone Therapeutics, Inc. Stockholder Litigation*, 115 A.3d 1173 (Del. 2015) ("Here, Plaintiffs do not need to prove that [the alleged controller] was a controlling stockholder in order to withstand the motions to dismiss. Rather, Plaintiffs must plead facts raising *the inference* that [the alleged controller] *could control* [the company].")). *But see Morton's Restaurant Group*, 74 A.3d at 664 (quoting *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989) ("[A] plaintiff must allege domination by a minority shareholder through actual control of corporate conduct.")); *Williamson v. Cox Communications, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) ("Simply alleging they had the *potential* ability to exercise control is not sufficient."). The distinction, however, is not material in this case because even if pleading potential control is sufficient, Plaintiff has not met that burden.
[31] Pl.'s Opp'n Br. at 18-19.
[32] *Id.* at 19.

As to Defendants, the Complaint pleads that Taft, as a Class A member of Management VII, "had the power to control and actually did exert control over (either directly or indirectly, or in combination with others) the management and policies of [Management VII]," by carrying out its purposes, entering into contracts, and performing acts "that he deemed necessary, advisable or incidental thereto in accordance with the policies of [Management VII]."[33] In addition, Plaintiff avers Taft was a Management VII officer and member of its board of managers and "had 'the authority, responsibilities and duties as are customary for officers holding similar positions.'"[34]

With respect to MPE, the Complaint alleges that "Taft, Tuleta and Machado, among others," were appointed managing directors of MPE and given "the powers and duties granted to such Person pursuant to consent by the Board."[35] Additionally, Plaintiff alleges Taft, Machado, and Tuleta each serve on MPE Management's board of managers, which effectively manages MPE. According to the Complaint, "[i]n this role, these individuals had and exercised actual, constructive or legal control over the management and policies of MPE, directly, indirectly, or in combination with others."[36] These, and other similar allegations, coupled with all reasonable inferences to be drawn from them, do not satisfy

---

[33] Compl. ¶ 56.
[34] Id. ¶ 61.
[35] Id. ¶ 78.
[36] Id. ¶ 79. See also, id. ¶¶ 44-46, 51, 57-60, 62-63, 67, 69, 80-81, 83, 86, 88-89.

14

Plaintiff's burden of pleading that Taft dominates and controls Defendants' or MPE's governing bodies.

The cases in which Delaware courts concluded a Plaintiff pleaded or proved that a minority stockholder was a controlling stockholder involve substantially more than the amorphous allegations on which Plaintiff relies. For example, in *In re Tesla Motors, Inc. Stockholder Litigation*, the Court of Chancery found the facts alleged in the complaint were sufficient to support a reasonable inference that Tesla's Chairman, CEO, and Chief Product Architect Elon Musk was a controlling stockholder even though he held only 22.1% of the company's voting control.[37] The complaint contained detailed allegations concerning Musk's influence as the "face" of Tesla and his ability to rally other stockholders to support his proposals.[38] Additionally, the company's own public filings acknowledged Tesla was dependent on Musk's leadership and his loss would cause disruption and a decline in the company's stock price.[39] The complaint also detailed Musk's past ouster of senior management with whom he disagreed, his control over the board's discussion of the challenged acquisition, and his personal relationships with other directors.[40] The combination of these well-pleaded facts regarding Musk's

---

[37] *Tesla*, 2018 WL 1560293, at *12-19.
[38] *Id.* at *15.
[39] *Id.* at *18-19.
[40] *Id.* at *15-17.

influence were sufficient to meet the plaintiffs' burden in that case, although the Court described that conclusion as a "close call".[41]

Likewise, in *In re Zhongpin Inc. Stockholders Litigation*, the court found the complaint adequately pleaded that Zhongpin's Chairman, CEO, founder, and largest shareholder Xianfu Zhu was a controlling shareholder even though he only owned 17.3% of the voting control.[42] The company had acknowledged in its 10-K that (i) Zhu had significant influence over the company's management and affairs, (ii) the company substantially relied on Zhu, and (iii) losing Zhu would have a material adverse effect on the company.[43] Additionally, through Zhu's stock ownership and influence at the company, he could exercise significant power over shareholder approvals for major company decisions and impede a potential acquirer or change in control.[44] Considering those well-pleaded facts, the court found the plaintiffs alleged an "indicia of domination[] sufficient to raise an inference that Zhu exercised control over Zhongpin."[45]

Finally, in *In re Cysive, Inc. Shareholders Litigation*, the Court of Chancery held in a post-trial opinion that a minority shareholder was a controlling shareholder.[46] In that case, Cysive's Chairman and CEO Nelson Carbonell owned

---

[41] *Id.* at *1, 19.
[42] *Zhongpin*, 2014 WL 6735457, at *6-9.
[43] *Id.* at *7-8.
[44] *Id.* at *9.
[45] *Id.*
[46] *In re Cysive, Inc. Shareholder Litigation*, 836 A.2d 531, 551-53 (Del. Ch. 2003).

16

35% of the voting control, and had up to a 40% voting block including stock options and his family members' shares.[47] The court noted that the practical realities of this voting block allowed Carbonell effectively to remove and replace the board of directors with little or no support from other shareholders.[48] Carbonell also was a hands-on CEO who was "involved in all aspects of the company's business," and even placed "two of his close family members in executive positions at the company."[49] Based on these factors, the court concluded Carbonell possessed a "combination of stock voting power and managerial authority that enable[d] him to control the corporation, if he so wishe[d]."[50]

The facts Plaintiff pleads about Taft's control at MPE or Defendants do not approach the level of those found sufficient in *Tesla*, *Zhongpin*, or *Cysive*. As to Management VII, the Complaint only makes generalized assertions regarding the power and authority granted to Taft as a Class A member, board member, and officer of Management VII. The governing documents make clear that any individual member or officer's authority is subject to the policies established by the Class A members or board of managers, depending on the power at issue. Those governing documents also make clear that the members or board of managers make decisions and set policies for Fund VII by majority vote. Plaintiff

---

[47] *Id.* at 535.
[48] *Id.* at 552.
[49] *Id.*
[50] *Id.* at 553.

fails to allege Taft has any unique influence over the other seven Class A members or managers of Management VII. Merely alleging that Taft has one vote out of eight among the Class A members, or that he (along with all other class members) can act on Defendants' behalf to carry out day-to-day functions, subject to the control of the majority of the Class A members, is not sufficient to permit an inference that he dominates and controls Defendants' governing bodies.[51]

The Complaint also does not describe any special influence Taft has in his roles at MPE, MPE General Partner, or MPE Management, or that he dominates and controls Tuleta and Machado. Instead, the Complaint merely recites grants of power and authority as they appear in the entities' operating agreements. The fact that Taft is one of MPE General Partner's three officers, with the authority to act on its behalf, does not, without more, permit an inference of control because that authority is subject to MPE Management's control, which in turn is directed by the unanimous decisions of its three-member board of managers. As one member of MPE Management's board, Taft lacks the power to force any particular action, and the Complaint does not allege that he otherwise wields sufficient influence to

---

[51] In its opposition to the motion to dismiss, Plaintiff seized on the fact that Fund VII's partnership agreement defines "General Partners" as Management VII's members. Fund VII Partnership Agreement at 5. Plaintiff argues this at least permits an inference that Taft, as one such member, is Fund VII's general partner. This inference is a stretch since Fund VII's partnership agreement elsewhere makes clear that Management VII is the Fund's only general partner. In any event, even if Taft is one of eight "General Partners," Management VII's operating agreement makes clear that his authority is limited to acting in accordance with the policies established by a majority of Management VII's Class A members. Management VII Operating Agreement §§ 5.1(d), 5.2.

18

dominate the other two board members. Although Taft effectively has a veto power by virtue of the unanimity requirement, that power alone or in conjunction with Plaintiff's other allegations is not sufficient to permit an inference that any one board member is a "controller" under Delaware law.[52] Moreover, although Plaintiff relies on statements MPE made on its website, to potential investors, and in press releases[53] suggesting the Defendants and MPE were and are linked, none of those statements suggest that one entity controls the other or is "commonly controlled," which is what Plaintiff must plead to support its claim that the entities are "Affiliates" under the SPA.

In summary, the Complaint fails to allege any special relationships or influence Taft has over either entity's managing members or his domination and control over board level decision-making. Accordingly, the Complaint does not sufficiently plead that Taft is a controlling person or Defendants and MPE commonly are controlled.

### C. Plaintiff has not sufficiently pleaded a control group.

The Complaint collectively refers to Taft, Tuleta, Machado, Yohe, and unidentified "others" controlling Defendants and MPE, collectively or

---

[52] *Williamson*, 2006 WL 1586375, at *5 ("There is no case law in Delaware . . . holding that board veto power *in and of itself* gives rise to a shareholder's controlling status."). *See also Tesla*, 2018 WL 1560293, at *15 (the Court considered "Musk's ability to utilize his 22% stake as a blocking position on significant matters" as one of many factors relevant to the controller analysis).

[53] *See* Compl. ¶¶ 91-96.

individually. Assuming Plaintiff is asserting that these individuals are a control group within Defendants or MPE, the Complaint fails to plead the existence of a control group. Delaware law recognizes "a number of shareholders, each of whom individually cannot exert control over the corporation . . . can collectively form a control group where those shareholders are connected in some legally significant way-e.g., by contract, common ownership, agreement, or other arrangement-to work together toward a shared goal."[54] Merely alleging a group of stakeholders have the same interests is not sufficient as a matter of law to prove a control group exists.[55] Here, apart from conclusory statements regarding Taft, Machado, Tuleta, Yohe and "others" and their positions as officers or employees of Defendants and MPE, Plaintiff has not pleaded that those individuals are connected in some legally significant way. Conclusory allegations of control are not sufficient.[56]

Accordingly, Plaintiff has not sufficiently alleged Defendants and MPE are "Affiliates" under the SPA, and the Complaint therefore fails adequately to plead a breach of contract claim against Defendants.

### D. The Complaint does not state a claim for breach the implied covenant of good faith and fair dealing.

The Complaint alleges the SPA contains an implied covenant of good faith and fair dealing requiring Defendants to "refrain from engaging in arbitrary or

---

[54] *Dubroff v. Wren Holdings, LLC*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009).
[55] *Id.*
[56] *Morton's Restaurant Group*, 74 A.3d at 664.

20

unreasonable conduct that had the effect of preventing [Plaintiff] from receiving the fruits of its bargain under that contract." Plaintiff contends Defendants breached that covenant when they, through their "Affiliate," solicited and employed Sumpter and Ramsay.[57] Defendants contend the SPA's express terms cover the issue here, and the Court cannot rewrite those terms to provide a broader definition of "Affiliate" than the one for which Plaintiff negotiated.

To sufficiently plead a breach of the implied covenant of good faith and fair dealing, the complaint "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[58] The Court will not imply contractual obligations unless there were "developments or contractual gaps that the asserting party pleads neither party anticipated."[59] The implied covenant does not apply when the contract's express terms address the conduct at issue, and the implied covenant cannot "grant contractual protections that parties forwent at the bargaining table."[60] The Court may not utilize the implied covenant to rewrite a contract simply because one party later believes it was a bad deal.

---

[57] Compl. ¶¶ 106-107.
[58] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)).
[59] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010).
[60] *Ashland LLC v. Samuel J. Heyman 1981 Continuing Trust for Heyman*, 2017 WL 1224506, at *7 (Del. Super. Mar. 30, 2017) (citing *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004)). *See also Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 896 (Del. 2015).

21

The Non-Solicitation Clause in the SPA plainly addresses the solicitation or employment of a Phillips employee by Defendants or one of their "Affiliates" before February 2017. The parties expressly defined "Affiliate" and "Control" and thereby established the parameters of the Non-Solicitation Clause. Accordingly, the express terms of the contract govern, and Defendants' conduct either was a breach of the Non-Solicitation Clause or it was not. The parties negotiated the contract's terms, and this Court cannot use the implied covenant to broaden the specifically contracted-for definition of "Affiliate" to cover the conduct in this case. The Court will not insert contractual protections that Plaintiff failed to negotiate for itself. Because the express terms of the SPA govern the alleged conduct, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED**. **IT IS SO ORDERED.**